**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MEREDITH CHADWICK RAY and** | ) | |
| **PHILLIP RAY,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **CASE NO:  3:07-cv-175** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **FORD MOTOR COMPANY, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

**SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANT PONTIAC COIL'S**
**MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**
_____

Pursuant to this Court's January 29, 2008 Order, the Plaintiffs file their Supplemental Brief in Opposition to Defendant Pontiac Coil's Motion to Dismiss for Lack of Personal Jurisdiction.  The Plaintiffs adopt and reallege their previously filed Brief in Opposition to Defendants' Motion as if set out here in full.

**I.    The Issue.**

The issue in this case is whether Pontiac Coil established "minimum contacts" in Alabama under the "stream of commerce" analysis set forth in World-Wide Volkswagen Corp. v. Woodsen, 444 U.S. 286, 100 S.Ct. at 567 (1980) and Asahi Metal Industries Co., Ltd. v. Superior Court of California, 480 U.S. 102, 107 S.Ct. 1026 (1987).  If the Court finds that Pontiac Coil has established "minimum contacts", then the analysis shifts to determine whether the exercise of personal jurisdiction over Pontiac Coil would offend "traditional notions of fair play and substantial justice."  Asahi, 480 U.S. at 113, 107 S.Ct. 1026.

II.    The "Minimum Contacts" Analysis As Applied to Pontiac Coil.

The Eleventh Circuit follows a three-part test in analyzing whether "minimum contacts" with a given forum are sufficient to permit the assertion of jurisdiction over an out-of-state Defendant:

> First, the contacts must be related to the Plaintiff's cause of action or have given rise to it.  Second, the contacts must involve "some act whereby the Defendant purposely avails itself of the privilege of conducting activities within the forum . . ., thus invoking the benefits and protections of its laws." Third, the Defendant's contacts with the forum must be "such that the Defendant could reasonably anticipate being hailed into court there."

CSX Transportation, Inc. v. Preussag International Steel Corp., 201 F.Supp. 2d 1228, 1231 (M.D. Ala. 2002) (quoting Vermeulen v. Renault U.S.A., Inc., 985 F.2d 1534, 1546 (11th Cir. 1993)).   Applying these factors to Pontiac Coil and the facts in this case, the evidence demonstrates that Pontiac Coil is subject to personal jurisdiction in this Court.

A.    It is undisputed that the plaintiffs' cause of action is directly related to Pontiac Coil's design and manufacture of solenoids contained within the brake transmission shift interlock device ("BTSI") of the subject Ford Mercury Mountaineer.

Pontiac Coil designed and manufactured the solenoid that was used in the subject vehicle's BTSI.  The purpose of the BTSI is to prevent the driver from getting the car out of park without putting his or her foot on the brake.  See Exhibit "A" attached. (Kenneth George depo. at 37, ln. 22-23; p. 38, ln. 1-4) This particular solenoid was designed specifically for use in the subject Ford Mercury Mountaineer.  (Id. at 25, ln. 4-17; p. 27, ln. 6-11)  It was designed to work with the electrical system in this vehicle. (Id. at p. 29, ln. 5-19.)  In this case, Plaintiffs allege that the BTSI failed to perform properly causing the subject vehicle to slip out of the Park position, resulting in Plaintiff

Meredith Ray being crushed by the vehicle and ultimately losing her leg. Ford testified that if Plaintiffs' allegations about the cause of the accident are true, then the BTSI and its component parts, including Pontiac Coil's solenoid, did not meet Ford's design intent. See Exhibit "B" attached. (Mark Taylor at 44, ln. 6-20) In other words, if what the Plaintiffs allege is true, the BTSI, which includes the solenoid, is defective. Thus, Pontiac Coil's design and manufacture of the solenoid and its placing of the solenoid in the stream of commerce are directly related to Plaintiffs' cause of action. Accordingly, the Plaintiffs have established the first element of the three-part "minimum contacts" test.

### B. Pontiac Coil purposely availed itself of the privilege of conducting activities within Alabama.

In order to establish "minimum contacts", a Defendant must also "purposefully avail[ ] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." Morris v. SSE, Inc., 843 F.2d 489, 492 (11th Cir. 1988) (quoting Burger King v. Rudzewicz, 471 U.S. at 476, 105 S.Ct. at 2184). In analyzing this element of the three-part test for "minimum contacts", courts have relied upon a "stream of commerce" theory. The stream of commerce theory was first addressed in World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297-98; 100 S.Ct. at 567 (1980). As to the issue of "purposeful availment", the World-Wide Volkswagen Court observed that, "while foreseeability that a product might enter a particular market is not sufficient by itself to demonstrate that a Defendant has purposefully availed itself of the benefits of that forum, neither is such foreseeability 'wholly irrelevant' to the analysis." CSX Transp., 201 F.Supp.2d at 1232 (citing World-Wide Volkswagen Corp., 444 U.S. at 297, 100 S.Ct. 559).

> Rather, if the sale of a product "is not simply an isolated occurrence, but arises from the efforts of a manufacturer or distributor to serve, directly or indirectly, the market for its product in other States," the Due Process Clause will not serve as a shield from liability in the event that the allegedly defective product causes injury in those States. The World-Wide Volkswagen Court further announced that the exercise of personal jurisdiction is appropriate "over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State."

Id. at 1232-1233 (quoting World-Wide Volkswagen at 297-98, 100 S.Ct. 559).

Several years later, in Asahi Metal Industry Co., Ltd. v. Superior Court of California, 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L. Ed. 2d 92 (1987), the Supreme Court sought to clarify World-Wide Volkswagen's "stream of commerce" analysis which, ironically, has only created further confusion.

In Asahi, a plurality opinion, Justice O'Connor devised a stream of commerce "plus" test. Under the "plus" theory, in addition to placing a product into the stream of commerce, a Defendant must have acted with "an intent or purpose to serve the market in the forum state." Asahi 480 U.S.at 112. Justice O'Conner's theory was the most restrictive with the required "plus" test. Justice Stevens, joined by two other justices in a separate concurrence, had a less restrictive approach. He pointed out the difficulty in drawing an "unwavering line … between 'mere awareness' that a component will find its way into the forum state and 'purposeful availment' of the forum's market." Asahi at 122. To determine "whether or not the conduct rises to the level of purposeful availment requires a constitutional determination that is affected by the volume, the value, and the hazardous character of the components" introduced into the stream of commerce. Id.

Finally, Justice Brennen's theory was the broadest of the minimum contacts tests. He, along with three other justices, concluded that placing the product into the

stream of commerce was sufficient to constitute purposeful activity directed toward the forum state.  "As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise.  Nor will the litigation present a burden for which there is no corresponding benefit."  Asahi at 1034, 1035.

The precise application of the three differing theories of Asahi remains unclear. "In the time since the Asahi decision was handed down, the Eleventh Circuit has provided no clear guidance as to the appropriate weight to be accorded to the competing stream of commerce theories."  CSX Transp., Inc. v. Preussag Intern. Steel Corp., 210 F. Supp.2d 1228, 1234, (M.D.Ala. 2002).  For example, in Vermeulen v. Renault U.S.A., Inc., 975 F.2d 746, 757, (C.A.11th 1992), the court held that the stream of commerce plus analysis is satisfied by delivery into the stream of commerce with the expectation of purchases made in the forum state.  However, the court declined to comment on which standard was controlling since the Vermeulen case satisfied even the more restrictive O'Connor "stream of commerce plus" test.  However, Vermeulen noted that "in the absence of further guidance from the Supreme Court, several courts have declined to follow the Asahi plurality's analysis, and have instead continued to apply the "stream of commerce" approach adopted in World-Wide Volkswagen." Vermeulen, 985 F.2d at 1548, fn. 17 (citations omitted).

Plaintiffs' research efforts have not found any Eleventh Circuit opinions which have definitively decided the proper application of Asahi.  However, in a recent district court opinion, the court there seems to have continued to apply the "stream of commerce" approach adopted in World-Wide Volkswagen.  In Pitts ex rel. Pitts v.

Seneca Sports, Inc., 321 F.Supp.2d 1353, (D.C.Ga. 2004), a products liability action arising from injury caused by a tent pole, the court determined that there was personal jurisdiction over the Defendant corporation from Massachusetts.  Since the Defendant "distributed its tents nationally," it was "chargeable with knowledge that some would ultimately be sold in Georgia Kmart stores." Pitts at 1357.  "[T]he sale of goods in another state, knowing that they will be resold in Georgia, is a purposeful activity sufficient to establish a 'contact' with Georgia." Pitts at 1357.

Here, because jurisdiction over Pontiac Coil is consistent with due process requirements under any of the three Asahi's "stream of commerce" analysis, this Court need not determine which standard should actually control this case.[1]  Pontiac Coil has facilities in the United States in both Michigan and Arkansas.  (George at 11, ln. 1-7)  It also has a facility overseas in England.  (Id.)  Pontiac Coil has close to 500 employees world-wide with the majority of them in the United States.  (Id. at 14, ln. 2-6)  Most of the products manufactured by Pontiac Coil are custom designed for specific customers.  (Id. at 24, ln. 10-12)  In this case, Pontiac Coil received a request for a quote to supply solenoids on the Ford vehicle.  (Id. at 25, ln. 19-23; p. 26, ln. 1-14)  The Defendant also received Ford's guidelines that outlined the environment that the solenoid had to be designed to operate in.  (Id. at 27, ln. 12-23; p. 28, ln. 1-6)  Pontiac Coil knew its solenoid had to be designed for the electrical system of the BTSI in the Ford vehicle.  In other words, the solenoid was designed to work within a particular electrical system of the Ford platform vehicle.  (Id. at 29, ln. 8-11; ln. 15-19)

---

[1] However, if the Court is inclined to make such a determination, the Plaintiffs argue that this Court should follow the observation of the Vermeulen Court and decline to follow Asahi's plurality's analysis until the Supreme Court gives further guidance on the issue.  Instead, this Court should continue to follow the "stream of commerce" approach adopted in World-Wide Volkswagen.  Vermeulen at 1548, fn. 17.

Pontiac Coil was given the vehicle platform and a projection on the volume of solenoids needed. (Id.) Pontiac Coil knew that it needed to produce 200,000 solenoids per year for between 3-5 years for Ford. (Id. at 37, ln. 1-21) Pontiac Coil recognized the safety implication of its products. This Defendant knew that lawsuits were filed in the early 80's as a result of cars slipping out of the parked position. (Id. at 38, ln. 1-18) The design and development of the BTSI, which included a solenoid, spawned from these lawsuits. (Id.) Pontiac Coil recognized that it needed to prevent cars from accidentally slipping out of the parked position in order to prevent injuries. (Id. at 39, ln. 3-15) This evidence overwhelmingly demonstrates that Pontiac Coil specifically designed the subject solenoid for this Ford platform vehicle; Pontiac Coil knew it would produce between 600,000- 1,000,000 of these solenoids for use in this platform vehicle; and Pontiac Coil knew that Ford would sell the vehicles, which contained this Defendant's solenoid, all over the country, including Alabama.

Further, the evidence indicates that Pontiac Coil did not just wash its hands of the product once it provided the solenoid to Ford. Instead, this Defendant was actively involved in monitoring the effectiveness and safety of its product after it was sent to consumers by being involved in the warranty claim process of Ford. If a warranty claim arose in the field in one of Ford's vehicles that involved the BTSI, that warranty claim was provided to Pontiac Coil for an engineering analysis of the cause of failure. (Id. at 48, ln. 14-19; p. 49, ln. 1-23; p. 51, ln. 16) Thus, if a warranty claim initiated from a consumer in Alabama concerning the BTSI, Pontiac Coil would investigate the claim through testing of the solenoid to determine if there is an actual problem. This Defendant would proactively request to be part of the disassembly of the device in order

to look for evidence of the cause of failure either with its part or some other component part. (Id. at 51, ln. 4-23; p. 52, ln. 1)  Thus, this Defendant purposefully availed itself of the benefits and protection of laws of Alabama by being actively engaged in responding to the needs of consumers using its product.

In addition, Pontiac Coil used its website as an advertisement for any customer looking to see the types of products Pontiac Coil designs and manufactures. (Id. at 45, ln. 1-10)  Not only do they provide component parts for Ford vehicles, they also provide parts to Chrysler, General Motors, Audi, and Honda.  (Id. at 42, ln. 8-23; p. 43, ln. 18-21)  They are also currently working with General Motors to be a direct supplier to GM. (Id. at 59, ln. 15-22) There are no states or places that Pontiac Coil has determined that it would try to sell in.  (Id. at 21, ln. 11-14)  Its website is accessible to any potential customers, including ones in Alabama.  (Id. at 53, ln. 7-15) [2]

This evidence demonstrates that Pontiac Coil did not just place a product into the stream of commerce.  Pontiac Coil designed a component part for a Ford's vehicle, using Ford's guidelines.  Pontiac Coil knew it would produce hundreds of thousands of these solenoids for Ford to place in its vehicles and distribute throughout the country. This Defendant knew the safety implications of its product.  The solenoid was designed for the purposes of preventing accidental injuries and deaths from a car slipping out of the parked position.  In fact, due to these safety implications, this Defendant remained proactive in the monitoring and evaluating the performance of the product in the field by

---

[2] Pontiac Coil relies upon third-party sales agencies to call upon customers in order to grow its sales. (Id. at p.16, ln. 4 - p.21, ln. 10)  With Alabama having three major car manufacturers within its borders (including Honda, a known recipient of Pontiac Coil's product), and numerous suppliers to those manufacturers, plaintiffs have simultaneously filed herewith a motion to continue the discovery deadline on personal jurisdiction.  Plaintiffs are attempting to schedule at least two depositions of this Defendant's outside sales agents to see who they call upon as customers and if any of those sales calls are directed towards potential customers in Alabama.

involving itself in Ford's warranty claim process.   "[T]here must come a point at which the volume or the value of sales knowingly garnered from a particular market should rise to the level of minimum contacts, regardless of whether a Defendant actively sought out the market in question." <u>CSX</u> at 1233.  "[T]he decision to continue to pursue a particular business model whose success depends in part on the market where a product eventually finds itself can sufficiently constitute 'purposeful availment.'" <u>CSX</u> at 1233.  The success of Pontiac Coil's business designing a component part of Ford's vehicle is based upon the market where the subject vehicle eventually found itself by distribution throughout the United States - Alabama.  When a Defendant's activities constitute a concerted effort to profit from the market in a particular forum, jurisdiction is not unreasonable in that forum when the Defendant's activities have been the source of injury to people within that forum.  <u>World-Wide Volkswagen</u>, 444 U.S. at 297, 100 S.Ct. 559.

<u>Asahi</u> not only spoke not of volume, but also of the value and hazardous character of the threat posed by a Defendant's conduct. <u>Asahi</u>, 480 U.S. at 122, 107 S.Ct. 1026.  Although not inherently dangerous, Pontiac Coil's solenoid is a vital component of the subject vehicle.  Should the solenoid fail to properly operate, a hazardous condition – the vehicle failing to remain in park - can occur.  Similarly, a gun safety switch is not inherently dangerous but if that safety fails in its single function, it creates a dangerous and hazardous condition.  As Justice Stevens pointed out, the hazardous character of the threat posed by a Defendant's conduct affects the determination of the level of "purposeful availment." <u>Asahi</u> at 122.  Pontiac Coil

purposefully availed itself of the benefits of the forum that it now asserts has no jurisdiction.

Pontiac Coil designed and supplied the solenoid for Ford's vehicle, with the knowledge that its part would be installed in the subject vehicle model and then distributed throughout the United States, including Alabama. Thus, personal jurisdiction is established as a result of Pontiac Coil's activity directed towards the State of Alabama and Pontiac Coil's contacts are more than adequate to meet the requirements set forth by <u>Asahi</u> and <u>World-Wide Volkswagen.</u>

>    **C.    Pontiac Coil's contacts were such that it could reasonably anticipate being hailed into court in Alabama.**

"Closely related" to the discussion of whether Pontiac Coil purposely availed itself of the forum, is whether or not Pontiac Coil could have reasonably anticipated a lawsuit in Alabama on the basis of such contacts. See <u>CSX Transportation, Inc.</u>, 201 F.Supp. 2d at 1231. Pontiac Coil should have reasonably anticipate being hailed into court in Alabama because it knew it was supplying hundreds of thousands of solenoids into Ford vehicles that would be delivered to customers nationwide, including Alabama. It knew its solenoid was a product specifically designed to improve the safety of the vehicle. It knew that its solenoid was developed as a result of lawsuits in which people were being killed and injured as a result of a car failing to stay in a parked position. Because of these safety implications, this Defendant is involved in Ford's warranty claims process with customers, which would included any customer having a claim in Alabama. If a customer files a warranty claim with Ford involving the BTSI, Pontiac Coil is contacted and is involved in the disassembly, analysis, and evaluation of the product

failure.  Under these circumstances, Pontiac Coil should have reasonably anticipate being hailed into court in Alabama where it is alleged that the solenoid that it designed, engineering, and manufactured for a Ford vehicle failed to properly function causing severe injury to the Plaintiffs.  As a result, the third and final element of the three-part test for establishing "minimum contacts" in the forum state has been met.

     **III.**     **Fair Play and Substantial Justice.**

     As mentioned earlier, once this Court has found that minimum contacts exist, the Court then must determine whether personal jurisdiction would offend "traditional notions of fair play and substantial justice."  <u>CSX Transportation, Inc.</u> at 1236-37 (citing <u>Asahi</u>, 480 U.S. at 113, 107 S.Ct. 1026.)

> This determination is essentially a reasonableness test in which the court considers the burden on the defendant, the interest of the forum state, and the Plaintiff's interest in obtaining relief.  The court's analysis also considers the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of several States in furthering fundamental social policies.

(Id. at 1237) (citations omitted).

     Alabama has a compelling interest in protecting persons within its borders from hazards caused by defective products manufactured by out-of-state Defendants.  See <u>Vermeulen</u> at 1551.  Meredith Ray suffered severe and permanent physical injuries, including the amputation of her leg, as a result of the defective BTSI that contained this Defendant's solenoid.  Alabama has a manifest interest in deterring future injuries and death of its citizens who may be exposed to defective products.  "Absent compelling circumstances, the State of Alabama should not be deprived of the authority to resolve such matters taking place within its borders."  <u>CSX Transportation, Inc.</u> at 1237.

Here, the Plaintiffs are from Alabama and the accident happened in Alabama. All of the Defendants are either Michigan corporations or have their principal place of business in Michigan. Thus, it appears that only one other state (Michigan) would be a permissible forum in which to join all parties. However, Pontiac Coil must demonstrate that the burden it bears by litigating in Alabama "is sufficiently weighty." (Id.) All of the witnesses to the accident and the treating physicians are in Alabama. The defective product is maintained in Alabama. There would be a substantial and heavy burden on the Plaintiffs and their witnesses to pursue this litigation in a Michigan court, which is thousands of miles away from their homes.

The burden would not be as great on Pontiac Coil to defend itself in Alabama in light of the fact that it is a global organization with facilities in Michigan, Arkansas and England and who has customers all over the world, including Honda, who has a manufacturing plant in Alabama. Thus, it would not be "inconsistent with fair play" to retain jurisdiction of Pontiac Coil in Alabama.

Moreover, there are concerns of judicial economy within the interstate system which favor a trial in a single forum. The dismissal of Pontiac Coil as a party to the present action would not end this litigation, but may actually splinter it. Certainly, "Alabama's interest in insuring safe travel within its borders, when viewed in conjunction with the judicial system's interest in efficient adjudication of such matters, more than outweighs any slight burden [Pontiac Coil] must overcome upon litigating in Alabama." CSX at 1237. It is simply not unreasonable to require Pontiac Coil to submit to the burdens of litigation in Alabama – the location of its product failure that resulted in

Meredith Ray's severe injuries.  Accordingly, the exercise of personal jurisdiction over Pontiac Coil would not offend the traditional notions of fair play and substantial justice.

**IV.     Conclusion.**

For these reasons, Plaintiffs respectfully request that this Court denies Pontiac Coil's motion to dismiss for lack of personal jurisdiction.  Pontiac Coil has established the required "minimum contacts" with Alabama and asserting jurisdiction over this Defendant would not offend traditional notions of fair play and substantial justice.


                                              /s/ D. Michael Andrews          .
                                             D. MICHAEL ANDREWS (AND076)
                                             BENJAMIN E. BAKER, JR. (BAK025)
                                             Attorneys for Plaintiffs

OF COUNSEL:

BEASLEY, ALLEN, CROW, METHVIN,
   PORTIS & MILES, P. C.
Post Office Box 4160
Montgomery, Alabama 36103-4160
(334) 269-2343
(334) 954-7555 – facsimile
mike.andrews@beasleyallen.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this date electronically filed the foregoing document with the Clerk of Court using the CM/ECF system to the following CM/ECF participants:

Bradley J. McGiboney
D. Alan Thomas
Huie, Fernambucq & Stewart, LLP
Three Protective Center
2801 Highway 280 South, Suite 200
Birmingham, Alabama 35223
(205) 251-1193
(205) 251-1256 – Facsimile
bjm@hfsllp.com
dat@hsfllp.com
**Attorneys for Ford Motor Company**

John C. Morrow
Geoffrey S. Bald
Burr & Forman LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama 35203
(205) 251-3000
(205) 458-5100 – Facsimile
jmorrow@burr.com
gbald@burr.com
**Attorneys for Pontiac Coil, Inc.**

Robert H. Sprain, Jr.
Irene Elizabeth Blomenkamp
G. Allen Meighen, Jr.
Sprain & Meighen, P.C.
1707 29th Court South
Birmingham, Alabama 35209
(205) 437-3232
(205) 802-7083 – Facsimile
rhs@sprainlaw.com
ireneblomenkamp@aol.com
**Attorneys for Visteon Corporation**

This **17th** day of **March**, **2008**.


               ____/s/ D. Michael Andrews_____
               Of Counsel

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE MIDDLE DISTRICT OF ALABAMA

3                    EASTERN DIVISION

4

5     CASE NUMBER:  3:07-CV-175

6

7     MEREDITH RAY and PHILLIP RAY,

8            Plaintiffs,

9                                    ORIGINAL

10    vs.

11

12    FORD MOTOR COMPANY, et al.,

13            Defendants.

14

15

16            DEPOSITION TESTIMONY OF:

17              KENNETH GEORGE

18

19

20          S T I P U L A T I O N S

21       IT IS STIPULATED AND AGREED by and

22    between the parties through their

23    respective counsel that the deposition of

**EXHIBIT A**

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 11

1    -- we have a facility in Nottingham,

2    England.  We have a facility in Searcy,

3    Arkansas, and our headquarters in

4    Clarkston. And I oversee all of our -- our

5    operations in both those offsite locations

6    and coordinate any new customer development

7    programs within all three sites.

8         Q.   When you say you oversee those

9    operations, does that mean you're in charge

10   of engineering and product development?

11        A.   Our primary engineering is at our

12   Clarkston facility.  The other two offsites

13   do not have engineering, so more on the

14   manufacturing side for the other two

15   facilities.

16        Q.   All right.

17        A.   So --

18        Q.   Would you deal with suppliers?

19        A.   I deal with suppliers, yes.

20        Q.   In terms of a -- I guess a

21   corporate hierarchy, give me a breakdown.

22        A.   I report to the owner of the

23   company, and I have a managing director at

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 14

1    how many employees Pontiac Coil has.

2        A.    Worldwide, close to 500.  There's

3    about 290 at our facility in Clarkston.

4    There's about 80 at our facility in Searcy,

5    Arkansas, and about 110 or so in our

6    facility in Nottingham, England.

7        Q.    All right.  Do your employees

8    communicate by E-mail?

9        A.    At times.

10       Q.    Okay.  Do you have an IT

11   department?

12       A.    We have an IT person, yes.

13       Q.    Okay.  What's his name?

14       A.    It's a her.  Lynn Cytrone.

15       Q.    Spell the last time, best you

16   can.

17       A.    C-Y-T-R-O-N-E.

18       Q.    And where is Lynn located?

19       A.    She's located in Clarkston.

20       Q.    If you had to describe her job

21   duties, what would you say?

22       A.    She's responsible for the

23   maintenance and the upkeep of the network

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 16

1    guess.  I didn't -- I didn't make that

2    term- -- determination, so I'm not

3    really...

4        Q.    So for a global company of 500 or

5    so employees, he would be the only

6    salesperson?

7        A.    He would be the only direct

8    salesman, yes.  We use sales

9    representation.

10       Q.    Okay.  Explain what you mean by

11    that.

12       A.    We have a rep -- well, hired a

13    rep firm in the local area that calls on

14    some of our local customers.  We have rep

15    firms elsewhere in Dayton, and we have one

16    in -- a couple -- one in Germany, one in

17    England that calls on specific accounts.

18    And we also, of course, check and our --

19    with our -- through an internal person

20    being formerly with Jack.  We call on -- we

21    have house accounts that are not

22    commissioned representation.

23       Q.    Longstanding accounts --

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 21

1    case-by-case basis.

2        Q.    All right.  Do you divide the

3    country up into geographic regions or --

4        A.    No.

5        Q.    So anything is open?

6        A.    Pretty much.

7        Q.    All right.  And then presently

8    you have Turner & Associates, and you have

9    another firm in Dayton?

10       A.    Dayton, Stork & Kelch.

11       Q.    Are there any states that you've

12   made a determination for whatever reason

13   that you're not going to sell to?

14       A.    No.

15       Q.    Okay.  And you said Turner is in

16   Clarkston?

17       A.    Yes.

18       Q.    How many customers currently does

19   Pontiac Coil service?

20       A.    Worldwide, probably in the area

21   of 20.

22       Q.    So it's a relatively short list?

23       A.    Yes.

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 24

1    you, or do you?

2         A.    We have a -- we acquired a

3    company called Liberty Controls about ten

4    years ago that had what they called a

5    standard catalog product, which were

6    standard solenoids, and when we acquired

7    the company for other reasons, it came

8    along with that standard catalog product.

9    So we still manufacture that catalog

10   product in our Alaska facility, but

11   everything else is custom designed for a

12   specific customer.

13        Q.    And the catalog product that

14   you're talking about, what is that

15   specifically?

16        A.    Just small -- it's a catalog of

17   the actuators and solenoids that we

18   manufacture.  It's standard sizes or a

19   range -- product family ranges of sizes.

20        Q.    The solenoid that's used in the

21   brake transmission shift interlock that you

22   mentioned earlier, is that a catalog item,

23   or is that --

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 25

1       A.    No.

2       Q.    -- specific design?

3       A.    Specific design.

4       Q.    And you said awhile ago that it

5    was specifically designed for a --

6       A.    A specific customer or

7    application.  In most cases, it's both.

8    It's a customer's application that --

9       Q.    And in the case of a brake

10   transmission shift interlock, you

11   ultimately know where that is going to go?

12      A.    In most cases, yes.

13      Q.    All right.  In the circumstance

14   where a solenoid is sold to Admiral Tool

15   and Manufacturing, you ultimately know

16   that's going to wind up in a Ford vehicle?

17      A.    Yes.

18      Q.    And how do you know that?

19      A.    Oftentimes when we get the

20   request for quote for a new program, we'll

21   be given the platform and, thus, the

22   vehicle platform that it would be used on,

23   or platforms.  Most often it's multiple

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 26

1    platforms with vines related so we know

2    what type of vines we're quoting to based

3    on the projections of that -- that

4    vehicle's sale, and often -- well, that's

5    -- I mean, that's pretty much the only

6    direct -- or not direct, but the only

7    communication we would have of where the

8    product is going.

9        Q.    All right.  And when you receive

10   the -- the statistics regarding volume and

11   platform, you would receive that from the

12   automaker?

13       A.    We would receive that from

14   Admiral.

15       Q.    From Admiral?

16       A.    Yes.

17       Q.    Who else does Admiral sell to?

18       A.    I don't know.

19       Q.    You don't know if they sell to GM

20   or --

21       A.    I don't know.

22       Q.    -- a foreign country?

23       A.    On this particular product -- or

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 27

1    in this -- with this particular customer,

2    it's the only product we sold to.  There

3    are a couple of product -- family of

4    product, and whether they have other

5    customers, I don't know that.

6        Q.    Okay.  Well, for this particular

7    product, this solenoid that's used in the

8    brake transmission shift interlock, when

9    you sold it to Admiral, you knew it was

10   going to go into a Ford vehicle?

11       A.    Ultimately, yes.

12       Q.    All right.  Because you had

13   received sales volume and platform

14   information?

15       A.    And in some cases, and quite

16   possibly this particular case, it was

17   specifications -- broad specifications were

18   passed down from ultimately Ford Motor

19   Company through the supply chain to us of

20   what specific -- or I wouldn't say

21   specific -- what general boundaries or

22   guidelines the product had to be designed

23   to operate in.

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 28

1        Q.    Okay.

2        A.    Temperatures, voltage, ranges,

3   those type of things.  And we were then,

4   you know, requested to design a product to

5   meet within those general specs.  It's more

6   often referred to as a black box design.

7        Q.    Let's talk about that for just a

8   second, because when I hear you say things

9   like operating range and temperature,

10  that's sort of the operating environment?

11       A.    Yes.

12       Q.    Did you also get, though, some

13  more specific guidelines in terms of

14  overall size?

15       A.    Sometimes we're given a general

16  package size which we have to fit within.

17  I mean, there's only so much room within a

18  vehicle and...

19       Q.    Right.  Would you be given

20  parameters for, say, electrical connectors?

21       A.    Often.

22       Q.    Okay.  And a barrel-type fuse as

23  opposed to a three-pin connector?

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 29

1          A.    A lot of times, because the

2    vehicle harness is dictating what

3    interconnect system, that that

4    information's in the specification.

5          Q.    So the -- the product, when it is

6    designed, would be designed to work with a

7    particular vehicle electrical system?

8          A.    Work within a particular

9    interconnect electrical system.  Whether

10   it's common to many vehicles, I don't know,

11   though.

12         Q.    Okay.

13         A.    So I don't know that it's vehicle

14   specific at that time.

15         Q.    I understand.  But in this case,

16   since you knew it was going to a Ford

17   vehicle, you knew it was going to work with

18   their electrical system?

19         A.    Yes.

20         Q.    What documents have you reviewed

21   in preparation for today's deposition?

22         A.    I reviewed Mike Gidley's

23   affidavit and just general knowledge from

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 37

1    going to say in the couple hundred thousand

2    units a year range.

3         Q.    For how many years?

4         A.    Could've been three, could've

5    been five, depending on whatever length of

6    contract our customer was given from their

7    customer.

8         Q.    So if we're looking at a couple

9    of hundred thousand a year for three to

10    five years, we're talking about 600,000 to

11    a million units?

12              MR. BALD:    Object to the form of

13    the question.

14         Q.    (BY MR. ANDREWS)    Is that

15    correct?

16              MR. McGIBONEY:    Object to the

17    form.

18         Q.    (BY MR. ANDREWS)    As best you can

19    answer.

20         A.    I mean, I guess doing the math,

21    yeah, that would make sense.

22         Q.    And what is your understanding

23    and purpose of the brake transmission shift

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 38

1    interlock?

2        A.    It is a device that inhibits the

3    driver from getting the car out of park

4    without their foot on the brake.

5        Q.    Do you know why that vehicle is

6    -- why that product is included in

7    passenger vehicles?

8        A.    I understand there was some

9    lawsuits back in the early '80s with Audi

10   that spawned this industry for us -- or

11   this product.  They have cars getting out

12   of park without people having their foot on

13   the brake.

14           MR. McGIBONEY:  Object to the

15   form.

16       Q.    (BY MR. ANDREWS)  So do you

17   understand, then, that there is a safety

18   implication involved in the product?

19           MR. BALD:  Object to the form.

20           MR. McGIBONEY:  Object to the

21   form.

22       Q.    (BY MR. ANDREWS)  There is

23   nothing wrong with that.  You can answer.

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 39

1              MR. McGIBONEY:  Same objection.

2         Q.   (BY MR. ANDREWS)  Go ahead.

3         A.   I guess, yes, I understand that

4    if a vehicle got out of park by any means

5    that wasn't controlled by the driver, that

6    there's a safety implication.

7         Q.   Right.  And as you said, the

8    brake transmission shift interlock is the

9    means by which the vehicle is prevented

10   from being removed from park without the

11   pressing of the brake?

12             MR. BALD:  Object to the form of

13   the question.

14             MR. McGIBONEY:  Same objection.

15        A.   Yes.

16        Q.   (BY MR. ANDREWS)  All right.

17   Where is Jack Corley located today?

18        A.   I believe in Birmingham.  I'm

19   sorry.  In Birmingham, Michigan.

20        Q.   All right.  Do you know where

21   he's employed?

22        A.   I don't know that he is employed.

23   This isn't recent.

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 42

1    Ford?

2         A.    I don't know that -- that that's

3    true.

4         Q.    All right.  At some point prior

5    to production, would you have known it was

6    a Ford vehicle?

7         A.    Possibly.

8         Q.    Okay.  But definitely at some

9    point during production, you learned that

10   it's a Ford vehicle that this part is used

11   in?

12        A.    Yes.

13        Q.    Okay.  Now, other than Ford, are

14   there other vehicle manufacturers that

15   utilize component parts manufactured by

16   Pontiac Coil?

17        A.    Yes.

18        Q.    Who are they?

19        A.    Our products go on Chryslers, go

20   on General Motors vehicles, go on Honda

21   vehicles, ultimately -- GM, Chrysler --

22   Audis.  I think that's pretty much all of

23   it.  That's pretty much all of it.

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 43

```
 1          Q.    Okay.  The Ogura company --

 2          A.    Yes.

 3          Q.    -- what manufacturers do they

 4    sell to?

 5          A.    They sell to Delphi, and they

 6    sell to Visteon, to my knowledge.  I don't

 7    know -- at least our products go through

 8    them to those customers.  I don't know what

 9    other manufacturers they would sell to.

10          Q.    You don't know where it goes

11    downstream from there?

12          A.    On our product, I do.  I don't

13    know what other customers they have.

14          Q.    I understand.  Specifically

15    restricting your answer to your products,

16    though --

17          A.    Uh-huh.

18          Q.    -- are there any Japanese

19    manufacturers that utilize your component

20    products?

21          A.    Honda.

22          Q.    Anyone else?

23          A.    I think that's it.
```

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 45

1          Q.    What was the purpose of the

2    website then?

3          A.    For an understanding of anyone

4    looking to find out about Pontiac Coil,

5    what type of products we make.

6          Q.    Used as an advertisement?

7               MR. BALD:  Object to the form.

8               MR. McGIBONEY:  Object to the

9    form.

10          A.    I guess, in a broad sense, yes.

11          Q.    (BY MR. ANDREWS)  Okay.  And that

12    was maintained in-house there at Pontiac

13    Coil?

14          A.    It -- I think it was a third

15    party.  I mean, we -- once every few years,

16    we would give an update to that third

17    party, and they would make the additions,

18    corrections, changes, whatever to the

19    website.  It was not an active -- you know,

20    where we change it daily or --

21          Q.    Who was that third-party company?

22          A.    I don't know that.

23          Q.    Would Jack know that?

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 48

1          Q.   Okay.  Now, in terms of warranty

2    work, if there were a claim that came into

3    Pontiac Coil from, in this case, Visteon

4    regarding some sort of warranty work -- has

5    that ever happened?

6          A.   We wouldn't get a warranty claim

7    back from Visteon in this case.

8          Q.   Where would you get a warranty

9    from?

10         A.   We would get it from Admiral, if

11   there was one.

12         Q.   Okay.

13         A.   They are our customer.

14         Q.   All right.  So if, ultimately, a

15   warranty claim arose out in the field in a

16   Ford vehicle, then that would go back up

17   the chain through Visteon, to Admiral, back

18   to Pontiac?

19         A.   That's correct.

20              MR. BALD:  Object to the form of

21   the question.

22         A.   I would assume so.  I believe

23   that's the chain.  I don't --

Page 49

1          Q.     (BY MR. ANDREWS)    Are you aware

2    of warranty claims involving Pontiac Coil

3    products?

4          A.     Yes.

5          Q.     Specifically involving brake

6    transmission shift interlock solenoids?

7          A.     Over the past 12 years, yes.

8          Q.     All right.   Give me an idea of

9    some of the warranty claims that Pontiac

10   Coil has dealt with in brake transmission

11   shift interlock solenoids.

12         A.     We've had an occasion here or

13   there where a -- on a -- or on a floor

14   shifter, when the -- when the product came

15   back to us and we analyzed the -- or, you

16   know, did our analysis of the cause of the

17   failure, oftentimes there isn't a problem

18   with the -- with the part when it comes

19   back to us.   So just because it's a

20   warranty claim coming through the system

21   back to Pontiac Coil does not necessarily

22   mean it's a defective part, okay?   It

23   could've been other components within the

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 51

1        A.    We manufactured the solenoid that

2   connected to other components, which causes

3   the shifter from being inhibited.

4        Q.    So in this case, if -- if a

5   warranty claim arose in the field from

6   Ford, traveled back up ultimately to

7   Pontiac, what part would you be testing

8   specifically?

9        A.    Just the solenoid.

10       Q.    I'm just making sure that I

11   understand what you were saying awhile ago,

12   that if a -- if a complaint arose regarding

13   the operation of the shift interlock, you

14   would not be looking at the overall shift

15   interlock system; you would only be looking

16   at the solenoid?

17            MR. BALD:  Object to the form.

18       A.    I believe we've done both.  We

19   request to be a part of the disassembly and

20   see how it integrates into the system

21   because oftentimes there could be evidence

22   there to indicate what the cause of the

23   failure was, not necessarily with our

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 52

1    solenoid or not.

2         Q.    (BY MR. ANDREWS)  Are you aware

3    of warranty claims involving the solenoid

4    utilized in the vehicle in this case?

5         A.    I'm not aware of any.

6         Q.    All right.  Were you involved in

7    the investigation into the Earlywine case

8    in California?

9         A.    No, sir.

10        Q.    Were you aware of that case at

11   all?

12        A.    No.  (Witness shakes head

13   negatively.)

14        Q.    All right.  Have you read any

15   depositions or anything in this case?

16        A.    No, I have not.

17        Q.    Okay.  In the deposition of the

18   corporate rep from Ford in this case, we

19   learned about at least one other similar

20   incident, and it's arguable at this point

21   whether or not Ford will agree to the

22   similarity, but ultimately we've been told

23   that there was a wiring issue that impeded

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 53

1    the operation of the solenoid.  Is it your

2    testimony you weren't aware of that

3    incident?

4        A.    That's correct.

5              MR. McGIBONEY:   Object to the

6    form.

7        Q.    (BY MR. ANDREWS)  Okay.  Did you

8    know the Pontiac Coil website is accessible

9    from customers in Alabama?

10       A.    I would assume it's available to

11   anybody worldwide.

12       Q.    Including people in Alabama?

13       A.    Yes.

14       Q.    I'm sorry?

15       A.    Yes.

16             MR. ANDREWS:  Let's take a quick

17   break.

18             THE VIDEOGRAPHER:  We're going

19   off the record at 9:43 a.m.

20             (Break taken.)

21             THE VIDEOGRAPHER:  We are back on

22   the record at 9:50 a.m.

23       Q.    (BY MR. ANDREWS)  Mr. George,

Page 59

1    tooling, all of that is owned by them.  The

2    purchase orders come through them, and we

3    are, I guess, effectively not allowed to

4    sell to anybody else --

5         Q.    Okay.

6         A.    -- their product.

7         Q.    And Mr. Andrews asked you some

8    questions about automakers, and you

9    testified that there is a number of

10   automakers to your knowledge that use

11   Pontiac Coil products?

12        A.    That our products end up on, yes.

13        Q.    And that's what I was getting at.

14        A.    Yes.

15        Q.    Do we sell -- does Pontiac Coil

16   sell directly to an auto manufacturer?

17        A.    In no cases do we sell -- we are

18   currently working with General Motors on a

19   new development program, which would be our

20   first, quote, tier one, unquote,

21   application where we'd work directly with

22   an OEM.

23        Q.    But as we sit here today, that

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 1

1                    IN THE UNITED STATES DISTRICT COURT

2                        FOR THE DISTRICT OF ALABAMA

3                            NORTHERN DIVISION

4

5    MEREDITH CHADWICK RAY

6    and PHILLIP RAY,                         ORIGINAL

7                    Plaintiffs,

8         vs.                            Case No. 3:07-cv-175

9    FORD MOTOR COMPANY, ET AL,

10                   Defendants.

11   ------------------------------

12

13

14       The Videotaped Deposition of MARK KIMBERLY TAYLOR,

15       Taken at 2501 Worldgateway Place,

16       Romulus, Michigan,

17       Commencing at 9:03 a.m.,

18       Friday, September 14, 2007,

19       Before Mary Jo Power, CSR-1404, RMR.

20

21

22

23                                      EXHIBIT

24                                        B

25

MERRILL LEGAL SOULTIONS
Court Reporting*Legal Videography*Trial Services

Page 44

1   A.   I don't believe so.

2   Q.   So as far as you know, there weren't moves from

3        different positions underneath the steering column or

4        along the firewall somewhere?

5   A.   Correct.

6   Q.   Earlier you said that it would not be possible to

7        shift it into park -- and we're talking about the 2002

8        Mountaineer -- shift the transmission into park

9        without engaging the BTSI.

10  A.   Correct.

11  Q.   All right.  If -- assume for me a hypothetical for a

12       second.  If it is possible to shift the vehicle into a

13       park position so that the transmission is in park, you

14       can actually feel the tang has engaged, and the shift

15       indicator on the dash panel is in the park position,

16       but yet you can then shift it out of that position

17       without depressing the brake pedal, based on your

18       knowledge of how the system works, what if anything

19       would that indicate to you?

20  A.   The vehicle does not meet design intent.

21  Q.   And what are some of the possible causes that it would

22       not meet design intent if -- if that operation is

23       correct?

24            MR. McGIBONEY:  Object to the form.

25            THE WITNESS:  Well, you know, that's -- the