IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| **MEREDITH CHADWICH RAY and PHILIP RAY,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **CIVIL ACTION NO. 3:07-CV-175** |
| **FORD MOTOR COMPANY, PONTIAC COIL, INC.; VISTEON CORPORATION, et al.,** | ) ) ) | |
| **Defendants.** | ) ) | |

**SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO DISMISS**

**COMES NOW**, Pontiac Coil, Inc., a Defendant in the above styled case, and hereby files the following supplemental brief in support of its motion to dismiss for lack of personal jurisdiction as ordered by the Trial Court:

**I. Introduction**

Pontiac Coil filed the present motion to dismiss for lack of personal jurisdiction on November 26, 2007. Pontiac Coil's motion is predicated on the fact that it has no connections or contacts with the State of Alabama and that the sole basis for jurisdiction in this case relies upon a "stream of commerce" theory based upon the fact that the solenoid manufactured by Pontiac Coil passed through intermediary suppliers and eventually was incorporated by Ford Motor Company into the vehicle being used by Meredith Ray at the time of the accident at issue in this case. There is no dispute that Pontiac Coil manufactured a solenoid which was sold to Admiral Toll & Manufacturing Company of Michigan (Admiral). Admiral then incorporated the solenoid into an automotive component and sold that component to Visteon Corporation. Visteon then

sold a component to Ford, which manufactured the vehicle involved in the accident at issue. Pontiac Coil has no other connection to the State of Alabama.

In their opposition to Pontiac Coil's motion to dismiss, Plaintiffs requested leave to conduct discovery on the issue of personal jurisdiction. On February 29, 2008, Plaintiffs conducted the deposition of Mr. Kenneth George, a corporate representative of Pontiac Coil made available to Plaintiffs to address any questions concerning Pontiac Coil's personal jurisdiction in the State of Alabama.[1] During his deposition, Mr. George testified that Pontiac Coil has no contacts or connections with the State of Alabama. Mr. George's deposition testimony is entirely consistent with the Affidavit of Mike Gidley, which was submitted to the Court on December 19, 2007, as an exhibit to Pontiac Coil's brief and memorandum in support of its motion to dismiss. There is, therefore, no additional evidence of any contacts between Pontiac Coil and Alabama.[2] Plaintiffs argue in their brief that Pontiac Coil is involved in warranty work after the manufacture and sale of solenoids to Admiral. Mr. George testified, however, that any involvement on the part of Pontiac Coil regarding warranty claims would only have occurred through Admiral, the entity that Pontiac Coil sells solenoids to. (George Deposition at p. 48). This fact does not provide any evidence of any connections or contacts between Pontiac Coil and the State of Alabama. The other evidence cited by Plaintiffs likewise does not provide any linkage or connection between Pontiac Coil and the State of Alabama.

On March 17, 2008, Plaintiffs requested additional time in order to take another deposition in their effort to demonstrate contacts between Pontiac Coil and the State of

---

[1] A copy of Mr. George's deposition testimony is attached hereto as Exhibit "1".

[2] The parties conducted an inspection of the subject vehicle on March 14, 2008, and confirmed that the solenoid was manufactured by Pontiac Coi.

Alabama.[3]  On April 23, 2008, Plaintiffs deposed Mr. Jack Corley.  Although the parties have not yet received the transcript of that deposition, Mr. Corley's testimony demonstrated that there are absolutely no connections between Pontiac Coil and the State of Alabama.  Pontiac Coil anticipates that Plaintiffs will contend that Pontiac Coil produces are used by Honda and that Pontiac Coil thereby has a connection with Alabama.  However, Mr. Corley testified that Pontiac Coil deals with third party suppliers located outside of Alabama.  There is no evidence that Pontiac Coil has any dealings directly with Honda or within Alabama.

## II. Argument

The evidence in this case firmly establishes that Pontiac Coil has no contacts or connections with the State of Alabama.  As addressed in Mr. Gidley's Affidavit, Kenneth George's deposition, and now Jack Corley's deposition, Pontiac Coil does not advertise in the State of Alabama, have any employees, agents, accounts, or customers in the State of Alabama, has no facilities located in the State of Alabama, and does not conduct any business in the State of Alabama.  Plaintiffs' position in this matter relies upon the proposition that by merely placing a product in the "stream of commerce" which then passed through two intermediate suppliers[4] and which was eventually sold by defendant Visteon to Ford Motor Company and incorporated by Ford Motor Company into the subject vehicle, Pontiac Coil is subject to personal jurisdiction in the State of Alabama.

---

[3] The Court granted Plaintiffs leave to take two depositions, Mr. Jack Corley and a representative of Turner Associates.  Neither of these individuals is employed by or under the control of Pontiac Coil.  Nevertheless, Mr. Corley was made available for deposition.  Turner Associates, however, indicated that they were not willing to provide a deposition without being ordered to do so by the Court.

[4] During his deposition, Mr. George testified that Pontiac Coil sells solenoids to a company known as Admiral Tool & Manufacturing, and that Admiral supplies products to Visteon who, in turn, supplies products to Ford.  (George Deposition, pp. 18-19).

In <u>Worldwide Volkswagon Corporation v. Woodson</u>, the United States Supreme Court held that "The Due Process Clause, by insuring the 'orderly administration of the laws,' (<u>International Shoe Company v. Washington</u>, 326 U.S. at 319, 66 S. Ct. at 159) gives a degree of predictability to the legal system that allows potential defendants to <u>structure</u> <u>their</u> <u>primary conduct</u> with some minimum assurance as to where that conduct will and will not render them liable to suit."   100 S. Ct. 559, 567 (emphasis added).   "The requirement for purposeful minimum contacts helps insure that nonresidents have a fair warning that a particular activity may subject them to litigation within the forum."   <u>Beverly Hills Fan Company v. Royal Sovereign Corp.</u>, 21 F.3d 1558, 1565 (Fed. Cir. 1994); <u>In re Farmland Industries, Inc. v. PCS</u>, 2007 WL 1018367 (M.D. Fla. 2007).   Accordingly, in analyzing the question of personal jurisdiction, the Due Process Clause requires that defendants be afforded an opportunity to structure their conduct so as to be able to reasonably predict where they will be subject to suit.

The United States Supreme Court most recently addressed the issue of personal jurisdiction in <u>Asahi Metal Industry Company, Ltd. v. Superior Court of California, Solano County</u>, 107 S. Ct. 1026 (1987).   Unfortunately, the <u>Asahi</u> case resulted in no majority opinion and three plurality opinions.   The Eleventh Circuit addressed the issue of personal jurisdiction subsequent to <u>Asahi</u> in the case of <u>Morris v. SSE, Inc.</u>, 843 F.2d 489 (11th Cir. 1988).   In <u>Morris</u>, the Eleventh Circuit analyzed the three tests that resulted from the <u>Asahi</u> opinion, known as the O'Connor test, the Stevens test, and the Brennan test.   <u>Id.</u> at 492 - 493.   In <u>Morris</u>, the Eleventh Circuit recognized that the Brennan test "is the broadest of the three minimum contacts" tests put forth in <u>Asahi</u>.   <u>Id.</u> at 493.

Plaintiff in <u>Morris</u> filed a wrongful death action against SSE, Inc. that arose out of a parachuting accident in Alabama.   <u>Id.</u> at 490.   The parachute which was being used by the

decedent included an automatic activation device bearing Serial Number 8004 which was designed and manufactured by SSE, a Pennsylvania corporation headquartered in New Jersey. Id. SSE filed a motion to dismiss for lack of personal jurisdiction contending that it had insufficient contacts with the State of Alabama to justify the imposition of personal jurisdiction.

After considering each of the three tests set forth in Asahi, the Eleventh Circuit held that the assertion of personal jurisdiction complied "with the O'Connor test announced in Asahi". Id. at 493.[5] The Eleventh Circuit in Morris held that the defendant was subject to personal jurisdiction because it placed products into the stream of commerce and "several aspects of SSE's activities constitute additional conduct" indicative of an intent or purpose to serve the Alabama market. Id. at 494. Specifically, the Court held that SSE repaired the very automatic activation device that failed at the request of an Alabama company. In addition, the Eleventh Circuit found that there was a reasonable inference that SSE advertised within Alabama. Id. The Eleventh Circuit did not address the question of whether or not the facts satisfied personal jurisdiction under the test articulated by Justice Brennan. As mentioned above, Justice Brennan's test is the broadest test for personal jurisdiction.[6] Had the Eleventh Circuit chosen to adopt the test articulated by Justice Brennan, there would have been no need for it to address whether or not the facts satisfied personal jurisdiction under the much stricter standard articulated by Justice O'Connor.

---

[5] The Eleventh Circuit also found that the product at issue fell within Justice Stevens' category of being a "hazardous product." Id. at 494. The Court also held, however, that the facts of the case did not meet the other Stevens factors and did not make any conclusion that personal jurisdiction met or failed to meet the Stevens test. Id.

[6] According to Justice Brennan, personal jurisdiction exists "as long as the participant in this process is aware that the final product is being marketed in the forum state." Id. at 493.

Subsequent to the Eleventh Circuit's decision in <u>Morris</u>, courts have addressed the question of whether personal jurisdiction exists under a stream of commerce theory.  In <u>In re Farmland Industries</u>, the court held that "the placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum state."  2007 WL 1018367 at *12 (M.D. Fla. March 20, 2007).  Citing <u>Asahi</u>, the court held that "a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State".  <u>Id.</u>  The court reached the same conclusion in <u>Nida Corp. v. Nida</u>, 118 F. Supp. 2d 1223, 1229 (M.D. Fla. 2000).  In <u>Nida</u>, the court again held that the placement of a product into the stream of commerce does not establish personal jurisdiction even if the defendant knows that commerce will sweep the product into the forum State, and that additional conduct of the defendant is necessary.  <u>Id.</u>  This additional conduct allows a party to structure its activities such that it can anticipate where it may be subject to personal jurisdiction.

Plaintiffs' reliance on the recent case of <u>Pitts ex rel. Pitts v. Seneca Sports, Inc.</u>, 321 F. Supp. 2d 1353 (D.C. Ga. 2004) is misplaced.  In <u>Pitts</u>, the district court held that the defendant tent manufacturing company "distributed its tents nationally and thus is chargeable with knowledge that some would ultimately be sold by George Kmart stores."  <u>Id.</u> at 1357.  <u>Pitts</u> is very different from the facts in this case due to the fact that Pontiac Coil does not distribute its products nationwide.  Rather, the evidence establishes that Pontiac Coil sold solenoids to Admiral which were inevitably incorporated into a Ford product.

Application of the O'Connor test in this case is particularly compelling in light of Pontiac Coil's business.  As discussed above, Pontiac Coil simply supplies solenoids to Admiral which in

turn supplies parts to Visteon which are then sold to Ford Motor Company and incorporated into Ford's products. If the Brennan test were to apply in this case, Pontiac Coil would effectively be subject to personal jurisdiction in every state in the Union, despite the fact that Pontiac Coil is two steps removed from Ford and, it the case of Alabama, has no connections with the State.[7] In effect, companies far removed from a company such as Ford would find themselves subject to being sued in each and every state based not upon their own acts and conduct, but rather, the conduct of an entirely separate company. This would, in effect, deny Pontiac Coil the ability to structure its conduct and thereby predict where it may be subject to suit.

The jurisdictional test articulated by Justice O'Connor at least requires the defendant to have made some purposeful availment or contact within the forum state and thereby at least afford a potential defendant the opportunity to regulate its own conduct in such a manner as to be able to reasonably predict where it may be subject to a lawsuit. Under Justice Brennan's analysis, Pontiac Coil would have no such opportunity other than to simply cease making this product. Justice Brennan's analysis could be appropriate in other circumstances. For instance, where a party designs a product for a specific market, or designs a product to comply with specific state law or regulations. However, these circumstances must allow a party to structure its activities such that it has some predictability regarding where it may be subject to suit. Application of Justice Brennan's test to the circumstances of this case would deny Pontiac Coil this due process right. In this case, Pontiac Coil has not engaged in any conduct, other than the act of placing solenoids into the stream of commerce, from which it could predict that it could be subject to suit in Alabama.

---

[7] The Brennan test could be a more appropriate test in other circumstances where the facts allowed the defendant the opportunity to structure its conduct such that it could reasonably predict where it could be subject to suit, for instance, where the party designed a product for a particular market.

Under the facts in this case, application of Justice O'Connor's test affords Pontiac Coil the opportunity to structure its primary conduct whereas the Brennan analysis does not. Accordingly, application of the O'Connor test is particularly applicable to the facts in this case. Plaintiffs cannot establish sufficient additional contacts outside of the mere stream of commerce to establish personal jurisdiction over Pontiac Coil in this matter.

### III. Conclusion

The Eleventh Circuit has applied the test articulated by Justice O'Connor in <u>Asahi</u> in a factual context very similar to the one presented in this case. Under the O'Connor analysis, Pontiac Coil does not have sufficient contacts with the State of Alabama to justify personal jurisdiction.[8] The Due Process Clause of the United States Constitution requires that Pontiac Coil have the opportunity and ability to regulate its own conduct with some assurance as to where its conduct will render them liable to suit. Application of the O'Connor test to the facts in this case affords Pontiac Coil this opportunity while the Brennan test does not. Under the application of the O'Connor test, personal jurisdiction does not exist in Alabama over Pontiac Coil and Pontiac Coil's motion to dismiss is due to be granted.

---

[8] There is also no evidence to satisfy the test articulated by Justice Stevens should the Court determine it applies to this case. There is no evidence that driving is a hazardous activity, that solenoids are dangerous or evidence as to the value and volume of the goods introduced in the stream of commerce and connected to the State of Alabama.

Respectfully submitted,


s/Geoffrey S. Bald
John C. Morrow ASB-9424-O77J
Geoffrey S. Bald ASB-0768-D46G

Attorneys for Defendant
PONTIAC COIL, INC.

**OF COUNSEL:**
BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100

## CERTIFICATE OF SERVICE

     I hereby certify that I have served a copy of the foregoing document by Notice of Electronic Filing, or, if the party served does not participate in Notice of Electronic Filing, by U.S. First Class Mail, hand delivery, fax or email on this the 1st day of May, 2008:

D. Michael Andrews, Esq.
Beasley, Allen, Crow, Methvin,
Portis & Miles, P.C.
P.O. Box 4160
Montgomery, Alabama  36103-4160

Bradley J. McGiboney, Esq.
Huie, Fernambucq & Stewart L.L.P.
2801 Highway 280 South, Suite 200
Birmingham, Alabama  35223

Irene E. Blomenkamp, Esq.
Sprain & Meighen, P.C.
1707 29th Court South
Birmingham, Alabama  35209

              s/Geoffrey S. Bald_____
              Of Counsel

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE MIDDLE DISTRICT OF ALABAMA

3                      EASTERN DIVISION

4

5       CASE NUMBER:   3:07-CV-175

6                                        COPY

7       MEREDITH RAY and PHILLIP RAY,

8              Plaintiffs,

9

10      vs.

11

12      FORD MOTOR COMPANY, et al.,

13             Defendants.

14

15

16             DEPOSITION TESTIMONY OF:

17                  KENNETH GEORGE

18

19

20          S T I P U L A T I O N S

21        IT IS STIPULATED AND AGREED by and

22      between the parties through their

23      respective counsel that the deposition of

Page 2

1    KENNETH GEORGE may be taken before Bridget

2    McClain, a Court Reporter and Notary Public

3    for the State at Large, at the offices of

4    Burr & Forman, 3400 Wachovia Tower, 420

5    20th Street North, Birmingham, Alabama, on

6    the 29th day of February, 2008, commencing

7    at approximately 9:05 a.m.

8         IT IS FURTHER STIPULATED AND AGREED

9    that the signature to and the reading of

10   the deposition by the witness not is

11   waived, the deposition to have the same

12   force and effect as if full compliance had

13   been had with all laws and rules of Court

14   relating to the taking of the depositions.

15        IT IS FURTHER STIPULATED AND AGREED

16   that it shall not be necessary for any

17   objections to be made by counsel to any

18   questions except as to form or leading

19   questions and that counsel for the parties

20   may make objections and assign grounds at

21   the time of trial or at the time said

22   deposition is offered in evidence, or prior

23   thereto.

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 3

1          In accordance with Rule 5(d) of the

2     Alabama Rules of Civil Procedure, as

3     amended, effective May 15, 1998, I, Bridget

4     McClain, am hereby delivering to D. Michael

5     Andrews, Esq., the original transcript of

6     the oral testimony taken the 29th day of

7     February, 2008, along with exhibits.

8          Please be advised that this is the

9     same and not retained by the Court

10    Reporter, nor filed with the Court.

11

12

13

14

15

16

17

18

19

20

21

22

23

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 4

1                    I N D E X

2

3    EXAMINATION BY:                    PAGE NO.

4    Mr. Andrews                              9

5                                           62

6    Mr. Bald                               57

7                                           66

8

9                 E X H I B I T S

10

11   FOR THE PLAINTIFFS:

12   1  - (website page)                   62

13

14

15

16   FOR THE DEFENDANT:

17   (None offered.)

18

19

20

21

22

23

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 5

```
 1              A P P E A R A N C E S

 2


 3      PRESENT  FOR  THE  PLAINTIFFS:

 4      D.  Michael  Andrews

 5      BEASLEY,  ALLEN,  CROW,  METHVIN,  PORTIS  &

 6       MILES

 7      218  Commerce  Street

 8      Montgomery,  AL   36104

 9


10


11      PRESENT  FOR  THE  DEFENDANT,  VISTEON:

12      Irene  E.  Blomemkamp

13      ATTORNEY  AT  LAW

14      1707  29th  Court  South

15      Birmingham,  AL   35209

16


17      FOR  THE  DEFENDANT,  FORD:

18      Bradley  J.  McGiboney

19      Huie,  Fernambucq  &  Stewart

20      Three  Protective  Center

21      2801  Highway  280  South

22      Suite  200

23      Birmingham,  AL   35223
```

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 6

```
 1      FOR THE DEFENDANT, PONTIAC COIL:

 2      Geoffrey S. Bald

 3      Burr & Forman

 4      3400 Wachovia Tower

 5      420 20th Street North

 6      Birmingham, AL   35203

 7

 8      ALSO PRESENT:

 9      Kyle McKinnon-videographer

10

11

12

13

14

15

16

17

18

19

20

21

22

23
```

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 7

1          I, Bridget McClain, a Court Reporter

2     and Notary Public, State of Alabama at

3     Large, acting as Commissioner, certify that

4     on this date, pursuant to the Alabama Rules

5     of Civil Procedure, and the foregoing

6     stipulation of counsel, there came before

7     me at the offices of Burr & Forman, 3400

8     Wachovia Tower, 420 20th Street North,

9     Birmingham, Alabama, commencing at

10    approximately 9:05 a.m., on the 29th day of

11    February, 2008, KENNETH GEORGE, witness in

12    the above cause, for oral examination,

13    whereupon the following proceedings were

14    had:

15

16          THE VIDEOGRAPHER:  Here begins

17    videotape number one in the deposition of

18    Ken George in the matter of Meredith Ray

19    and Phillip Ray versus Ford Motor Company,

20    et al.  This -- it's Case Number

21    3:07-CV-175.

22          We're on the record at 9:05 a.m.

23    on February 29th, 2008.  This deposition is

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 8

1    taking place at the offices of Burr &

2    Forman, located at 3400 Wachovia Tower, 420

3    20th Street North, Birmingham, Alabama,

4    35203.  The court reporter is Bridget

5    McClain, and the videographer is Kyle

6    McKinnon.

7            Would counsel please identify

8    yourselves and state whom you represent?

9            MR. ANDREWS:  Mike Andrews,

10   counsel for the Plaintiffs.

11           MR. BALD:  Geoff Bald, counsel

12   for Pontiac Coil.

13           MS. BLOMENKAMP:  Irene Blomenkamp

14   counsel for Visteon.

15           MR. McGIBONEY:  Brad McGiboney,

16   counsel for Ford Motor Company.

17           THE VIDEOGRAPHER:  All right.

18   Would the court reporter please swear in

19   the witness?

20

21           KENNETH GEORGE

22   was sworn (affirmed) testified as follows:

23

Page 9

1               COURT REPORTER:  Usual

2      stipulations?

3               MR. ANDREWS:  That's fine.

4               MR. BALD:  Read and sign.

5

6      EXAMINATION BY MR. ANDREWS:

7          Q.   State your name for the record,

8      please.

9          A.   Kenneth George.

10         Q.   Mr. George, you and I just met

11     for the first time a few moments ago.  My

12     name is Mike Andrews.  I represent the

13     Plaintiffs in this case.  I'm going to ask

14     you a series of questions.  I assume you've

15     given a deposition before?

16         A.   Yes, I have.

17         Q.   Okay.  Just so we're clear on the

18     ground rules, if I ask you something you

19     don't understand for whatever reason, let

20     me know.

21         A.   Okay.

22         Q.   I'll try to clear it up.  Anytime

23     you want to take a break -- we may not go

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 10

1    long enough that you'll need one, but if

2    you do, just say the word, okay?

3        A.    Okay.

4        Q.    All right.  To kind of go back

5    and cover what -- a little bit of what I

6    just said, have you given a deposition

7    before?

8        A.    I have on a personal level, in a

9    divorce proceeding, but not in a -- from a

10   business standpoint, I've never.

11       Q.    Okay.  How long ago did you give

12   a personal deposition?

13       A.    About two months ago.

14       Q.    Okay.  You are employed where

15   today?

16       A.    Pontiac Coil, located 5800 Moody

17   Drive in Clarkston, Michigan.

18       Q.    All right.  And what is your

19   capacity with Pontiac Coil?

20       A.    I'm director of global program

21   development.

22       Q.    What does that mean?

23       A.    I oversee our global -- we have a

Page 11

1   -- we have a facility in Nottingham,

2   England.  We have a facility in Searcy,

3   Arkansas, and our headquarters in

4   Clarkston. And I oversee all of our -- our

5   operations in both those offsite locations

6   and coordinate any new customer development

7   programs within all three sites.

8        Q.   When you say you oversee those

9   operations, does that mean you're in charge

10  of engineering and product development?

11       A.   Our primary engineering is at our

12  Clarkston facility.  The other two offsites

13  do not have engineering, so more on the

14  manufacturing side for the other two

15  facilities.

16       Q.   All right.

17       A.   So --

18       Q.   Would you deal with suppliers?

19       A.   I deal with suppliers, yes.

20       Q.   In terms of a -- I guess a

21  corporate hierarchy, give me a breakdown.

22       A.   I report to the owner of the

23  company, and I have a managing director at

**MERRILL LEGAL SOULTIONS**
**Court Reportiong*Legal Videography*Trail Services**

Page 12

1      my Nottingham facility that reports to me,

2      and I have a plant manager at the Arkansas

3      facility that reports to me, and, of

4      course, all the structure below them.

5          Q.    Okay.  We had an affidavit

6      produced to us in this case in connection

7      with the allegations regarding personal

8      jurisdiction, and it was an affidavit from

9      someone named Michael Gidley.

10         A.    Mike Gidley is a -- he's one of

11     the new owners.  Pontiac Coil was just

12     recently -- the sole owner sold 70 percent

13     of it to three other partners, and Mike is

14     one of them, and he is legal counsel as

15     well.  He is a -- or I should say he's an

16     attorney --

17         Q.    All right.

18         A.    -- by background.

19         Q.    He signed it as an executive vice

20     president of Pontiac Coil?

21         A.    That's correct.

22         Q.    All right.  So would he be above

23     or below you in the hierarchy?

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 13

1          A.    He is above me.  He is one of the

2     four owners now.  I report to one of the

3     other owners.

4          Q.    What is your educational

5     background?

6          A.    I have a bachelor's degree in

7     industrial engineering from Western

8     Michigan University.

9          Q.    Did you go any beyond the

10    bachelor's?

11         A.    No.

12         Q.    Okay.  And how long have you been

13    employed at Pontiac Coil?

14         A.    12-and-a-half years.

15         Q.    Has your work history at Pontiac

16    Coil always been in your current capacity,

17    or has it changed over the years?

18         A.    It's changed.  I -- I mean, I

19    started in the plant management, operations

20    management.  I've -- but predominantly been

21    on the operations and customer development

22    side throughout my career.

23         Q.    All right.  Give me an idea of

Page 14

1    how many employees Pontiac Coil has.

2         A.    Worldwide, close to 500.  There's

3    about 290 at our facility in Clarkston.

4    There's about 80 at our facility in Searcy,

5    Arkansas, and about 110 or so in our

6    facility in Nottingham, England.

7         Q.    All right.  Do your employees

8    communicate by E-mail?

9         A.    At times.

10        Q.    Okay.  Do you have an IT

11   department?

12        A.    We have an IT person, yes.

13        Q.    Okay.  What's his name?

14        A.    It's a her.  Lynn Cytrone.

15        Q.    Spell the last time, best you

16   can.

17        A.    C-Y-T-R-O-N-E.

18        Q.    And where is Lynn located?

19        A.    She's located in Clarkston.

20        Q.    If you had to describe her job

21   duties, what would you say?

22        A.    She's responsible for the

23   maintenance and the upkeep of the network

Page 15

1    and people's personal -- your laptop

2    computers or office computers in the event

3    that there's any software that needs to be

4    loaded or fixed.

5        Q.    Do you have a marketing

6    department?

7        A.    We have a sales -- have a

8    salesperson.  I wouldn't call it a

9    marketing department.

10        Q.    Okay.  Who is that?

11        A.    Actually, we're currently

12    looking.  We -- we have severed our

13    relationship with our sales manager a

14    couple of weeks ago.

15        Q.    All right.  Who was your former

16    sales manager?

17        A.    Jack Corley.

18        Q.    Corley?

19        A.    Corley, C-O-O -- C-O-R-L-E-Y.

20        Q.    What caused you to sever your

21    relationship?

22        A.    Long-term -- just performance

23    issues relative to accomplishing things, I

Page 16

1    guess.  I didn't -- I didn't make that

2    term- -- determination, so I'm not

3    really...

4        Q.    So for a global company of 500 or

5    so employees, he would be the only

6    salesperson?

7        A.    He would be the only direct

8    salesman, yes.  We use sales

9    representation.

10       Q.    Okay.  Explain what you mean by

11   that.

12       A.    We have a rep -- well, hired a

13   rep firm in the local area that calls on

14   some of our local customers.  We have rep

15   firms elsewhere in Dayton, and we have one

16   in -- a couple -- one in Germany, one in

17   England that calls on specific accounts.

18   And we also, of course, check and our --

19   with our -- through an internal person

20   being formerly with Jack.  We call on -- we

21   have house accounts that are not

22   commissioned representation.

23       Q.    Longstanding accounts --

Page 17

1          A.    Longstanding accounts, yes.

2          Q.    -- that would be serviced?

3                Okay.  And I didn't tell you this

4    earlier, but in normal conversation, it's

5    easy for you and I to talk over each

6    other --

7          A.    Right.

8          Q.    -- and hopefully I'll hear what

9    you're saying, but our court reporter needs

10   to be able to take everything down.  So

11   it'll work best, and -- and probably you'll

12   maybe give me a chance to fumble the

13   question, if you'll let me finish first,

14   and then you give me your response because,

15   otherwise, it makes it very difficult for

16   her.

17         A.    Fine.

18         Q.    Thank you.

19               Give me an idea of who the house

20   accounts would be for Jack Corley?

21         A.    Delphi; a company called Behr,

22   B-E-H-R.  Those were the two main -- Ogura,

23   O-G-U-R-A.  They're a Japanese subsupplier.

Page 18

1      I think those were the three main -- and

2      Eaton.

3            Q.    E-A-T-O-N?

4            A.    Yes.

5            Q.    Okay.

6            A.    There was a lot of smaller ones,

7      but those are the main ones.

8            Q.    All right.  Now, in this case,

9      we've got another Defendant named Visteon?

10           A.    Yes.

11           Q.    Would Visteon be a house account,

12     or would it be one that would be serviced

13     by an outside rep?

14           A.    We don't sell directly to

15     Visteon.

16           Q.    Okay.  All right.  Tell me -- and

17     we'll go into detail a little bit more, but

18     tell me how that arrangement works.

19           A.    With Visteon or with --

20           Q.    With Visteon.

21           A.    We supply a product -- or

22     supplied a product to a company called

23     Admiral Tool and Manufacturing, and they, I

Page 19

1    believe, supplied to Visteon, whom, I

2    believe, supplies it to Ford.

3         Q.    All right.    Where would Admiral

4    Tool and Manufacturing fall in the sales

5    hierarchy?    Would that be an internal house

6    account?

7         A.    Admiral was a represented

8    account.

9         Q.    Represented by the firm in

10   Dayton?

11        A.    No.    Turner & Associates, which

12   is outside of Clarkston.

13        Q.    And tell me what you mean by

14   hiring an outside representative.    Like,

15   for example, in the case of Turner &

16   Associates, what would they do?

17        A.    They would call on various

18   selected accounts to look for or try to

19   procure additional sales or request for

20   quotes from those particular companies that

21   they are calling on.

22        Q.    For existing customers?

23        A.    It could be an existing customer.

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 20

```
 1        Q.   Okay.  What about in terms of

 2   generating new sales leads, how does that

 3   work?

 4        A.   If we get a sales lead that comes

 5   into the company and it's in either -- it

 6   -- it falls within the geographic broad

 7   location of our -- where we wouldn't be

 8   able to service it real well from our

 9   facility in Clarkston, then we would call

10   up our representative and say, here, go

11   into this account, we've gotten a lead,

12   find out what it's about.

13        Q.   Okay.  Where would -- your sort

14   of geographic area that you would serve

15   direct, where would that boundary be?

16        A.   It -- it kind of crosses over

17   with Turner & Associates because they're

18   also directed -- they were originally our

19   sole source of representation, and as the

20   company grew, then we kind of brought some

21   in-house and left them to take some of the

22   others and any new potentials that come up.

23   We would make that decision on a
```

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 21

1    case-by-case basis.

2         Q.    All right.  Do you divide the

3    country up into geographic regions or --

4         A.    No.

5         Q.    So anything is open?

6         A.    Pretty much.

7         Q.    All right.  And then presently

8    you have Turner & Associates, and you have

9    another firm in Dayton?

10        A.    Dayton, Stork & Kelch.

11        Q.    Are there any states that you've

12   made a determination for whatever reason

13   that you're not going to sell to?

14        A.    No.

15        Q.    Okay.  And you said Turner is in

16   Clarkston?

17        A.    Yes.

18        Q.    How many customers currently does

19   Pontiac Coil service?

20        A.    Worldwide, probably in the area

21   of 20.

22        Q.    So it's a relatively short list?

23        A.    Yes.

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 22

```
 1          Q.    Do you deal with the customers

 2    yourself?

 3          A.    I do, yes.

 4          Q.    All right.  And in the case of

 5    Admiral Tool and Manufacturing, would you

 6    deal with them directly?

 7          A.    Yes, I do.

 8          Q.    What does Pontiac Coil do?

 9          A.    We're manufacturers -- design,

10    engineering, and manufacturing of

11    electromechanical devices, solenoids,

12    actuators, that -- coil-related product,

13    coil being defined as an electromagnetic

14    coil, not a spring coil.

15          Q.    An electrical winding that

16    would be --

17          A.    Yes.

18          Q.    -- electrically actuated?

19          A.    Yes.

20          Q.    Okay.  And what are the uses of

21    the electromechanical coil products

22    produced by Pontiac?

23          A.    Various automotive and industrial
```

Page 23

1    applications, a wide variety, anywhere from

2    a fuel injector -- or stator, fuel injector

3    stator to an air-conditioning clutch coil

4    to a brake transmission shift interlock.

5    We also make coils for the hydraulic

6    control systems both on -- any equipment

7    that -- that uses hydraulic controls, our

8    coils actuate the valves, and on mobile

9    equipment like John Deere, Caterpillar,

10   those type of things, earth-moving

11   equipment where they're using hydraulic

12   controls.

13        Q.   Okay.  You threw out a couple of

14   specific heavy equipment manufacturer

15   names.

16        A.   Yes.

17        Q.   When Pontiac Coil manufactures a

18   component part, does it know ultimately

19   where that part is going to go?

20        A.   Sometimes; not all the time.

21        Q.   Okay.  And I guess specifically

22   what I'm wondering is, you don't

23   manufacture just an off-the-shelf item, do

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 24

1   you, or do you?

2        A.   We have a -- we acquired a

3   company called Liberty Controls about ten

4   years ago that had what they called a

5   standard catalog product, which were

6   standard solenoids, and when we acquired

7   the company for other reasons, it came

8   along with that standard catalog product.

9   So we still manufacture that catalog

10  product in our Alaska facility, but

11  everything else is custom designed for a

12  specific customer.

13       Q.   And the catalog product that

14  you're talking about, what is that

15  specifically?

16       A.   Just small -- it's a catalog of

17  the actuators and solenoids that we

18  manufacture.  It's standard sizes or a

19  range -- product family ranges of sizes.

20       Q.   The solenoid that's used in the

21  brake transmission shift interlock that you

22  mentioned earlier, is that a catalog item,

23  or is that --

Page 25

1       A.     No.

2       Q.     -- specific design?

3       A.     Specific design.

4       Q.     And you said awhile ago that it

5  was specifically designed for a --

6       A.     A specific customer or

7  application.  In most cases, it's both.

8  It's a customer's application that --

9       Q.     And in the case of a brake

10  transmission shift interlock, you

11  ultimately know where that is going to go?

12      A.     In most cases, yes.

13      Q.     All right.  In the circumstance

14  where a solenoid is sold to Admiral Tool

15  and Manufacturing, you ultimately know

16  that's going to wind up in a Ford vehicle?

17      A.     Yes.

18      Q.     And how do you know that?

19      A.     Oftentimes when we get the

20  request for quote for a new program, we'll

21  be given the platform and, thus, the

22  vehicle platform that it would be used on,

23  or platforms.  Most often it's multiple

Page 26

1    platforms with vines related so we know

2    what type of vines we're quoting to based

3    on the projections of that -- that

4    vehicle's sale, and often -- well, that's

5    -- I mean, that's pretty much the only

6    direct -- or not direct, but the only

7    communication we would have of where the

8    product is going.

9        Q.    All right.  And when you receive

10   the -- the statistics regarding volume and

11   platform, you would receive that from the

12   automaker?

13       A.    We would receive that from

14   Admiral.

15       Q.    From Admiral?

16       A.    Yes.

17       Q.    Who else does Admiral sell to?

18       A.    I don't know.

19       Q.    You don't know if they sell to GM

20   or --

21       A.    I don't know.

22       Q.    -- a foreign country?

23       A.    On this particular product -- or

Page 27

1    in this -- with this particular customer,

2    it's the only product we sold to.  There

3    are a couple of product -- family of

4    product, and whether they have other

5    customers, I don't know that.

6        Q.    Okay.  Well, for this particular

7    product, this solenoid that's used in the

8    brake transmission shift interlock, when

9    you sold it to Admiral, you knew it was

10   going to go into a Ford vehicle?

11       A.    Ultimately, yes.

12       Q.    All right.  Because you had

13   received sales volume and platform

14   information?

15       A.    And in some cases, and quite

16   possibly this particular case, it was

17   specifications -- broad specifications were

18   passed down from ultimately Ford Motor

19   Company through the supply chain to us of

20   what specific -- or I wouldn't say

21   specific -- what general boundaries or

22   guidelines the product had to be designed

23   to operate in.

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 28

1        Q.    Okay.

2        A.    Temperatures, voltage, ranges,

3    those type of things.  And we were then,

4    you know, requested to design a product to

5    meet within those general specs.  It's more

6    often referred to as a black box design.

7        Q.    Let's talk about that for just a

8    second, because when I hear you say things

9    like operating range and temperature,

10   that's sort of the operating environment?

11       A.    Yes.

12       Q.    Did you also get, though, some

13   more specific guidelines in terms of

14   overall size?

15       A.    Sometimes we're given a general

16   package size which we have to fit within.

17   I mean, there's only so much room within a

18   vehicle and...

19       Q.    Right.  Would you be given

20   parameters for, say, electrical connectors?

21       A.    Often.

22       Q.    Okay.  And a barrel-type fuse as

23   opposed to a three-pin connector?

Page 29

1          A.    A lot of times, because the

2    vehicle harness is dictating what

3    interconnect system, that that

4    information's in the specification.

5          Q.    So the -- the product, when it is

6    designed, would be designed to work with a

7    particular vehicle electrical system?

8          A.    Work within a particular

9    interconnect electrical system.    Whether

10   it's common to many vehicles, I don't know,

11   though.

12         Q.    Okay.

13         A.    So I don't know that it's vehicle

14   specific at that time.

15         Q.    I understand.    But in this case,

16   since you knew it was going to a Ford

17   vehicle, you knew it was going to work with

18   their electrical system?

19         A.    Yes.

20         Q.    What documents have you reviewed

21   in preparation for today's deposition?

22         A.    I reviewed Mike Gidley's

23   affidavit and just general knowledge from

Page 30

1    back -- you know, I mean, being around when

2    we launched this program, I mean, I know of

3    the program, I know of the product, and I

4    know the customers, so...

5        Q.    Okay.  You said you knew of the

6    program, the product, and the customer?

7        A.    That being Admiral.

8        Q.    All right.  And then the program?

9        A.    Just that -- this particular

10   product program.  I mean, you know, it's --

11   we -- there were two products that we

12   provided for Admiral right around the same

13   time, two BTSI products for two different

14   type products for six -- for both BTSI's,

15   but for different vehicle platforms, which

16   had different designs.

17           MR. BALD:  Ken, I'm not sure if

18   you're doing it, but I was going to say

19   make sure Mike gets to ask his whole

20   question.

21           THE WITNESS:  Okay.

22           MR. BALD:  I'm not sure if you

23   cut him off there or not.

Page 31

1              THE WITNESS:  Did I?  I'm sorry.

2         Q.    (BY MR. ANDREWS)  You did fine.

3    Just for the purposes of the court

4    reporter, though, BTSI is B-T-S-I?  That's,

5    as I understand it, short for brake

6    transmission shift interlock?

7         A.    That's correct.

8         Q.    Okay.  Now, going back to what

9    you said, the product program and the

10   customer, and you said you're familiar with

11   this product program because at the time

12   that it was phased in, two different maybe

13   overall types of BTSI's were produced for

14   Admiral?

15        A.    That's correct.

16        Q.    And explain that a little bit

17   more.  What do you mean by that?

18        A.    Well, there were -- Admiral was

19   producing within a similar -- maybe within

20   a year or two of each other -- two

21   different column application -- your column

22   requirements that had different BTSI or

23   brake transmission shift requirements, one

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 32

1    being a -- I believe it was a U-52, and the

2    one being a U-20 -- 222.  Those were the

3    platform names or the product type general

4    names that it was referred to by -- you

5    know, by Admiral to us, which had

6    dissimilar designs, both brake transmission

7    shift interlocks, but had different

8    designs, different interconnects.  One had

9    a switch on it, the other didn't, you know,

10   in the wiring harness, that type of a

11   differentiation.

12        Q.   Did -- so did you understand that

13   was for two different vehicle platforms?

14        A.   Yes.

15        Q.   Okay.  And on the U-52 platform,

16   which vehicles did that include?

17        A.   I -- I don't know that.

18        Q.   That's not something that you

19   would have received?

20        A.   I mean, at the time, I could've

21   tracked it back, but at the -- most often,

22   they're given those code names in -- you

23   know, they're early in the program, so I

Page 33

1    wouldn't know what --

2         Q.    Okay.  So early in the program if

3    you're given just a -- some sort of generic

4    U-52, for example, you might not know which

5    vehicle --

6         A.    That's correct.

7         Q.    -- is involved?

8              Later on in the production cycle,

9    though, isn't it true that you learned

10   which vehicles those products were used on?

11        A.    Yes.

12        Q.    All right.  And in this case, at

13   some point, you would've learned that the

14   brake transmission shift interlock was

15   actually being used in Explorers and

16   Mountaineers?

17             MR. BALD:  Just real quickly,

18   if -- if there's anything that you've

19   learned by virtue of our conversations,

20   that's privileged.  Otherwise, if you've

21   learned it from other sources, you can go

22   ahead and answer his question.

23             MR. McGIBONEY:  Object to the

Page 34

1    form.

2        Q.    (BY MR. ANDREWS)  They obviously

3    don't like that, so go ahead.

4        A.    Well, yeah, I mean, I --

5    I -- I can tell you that I personally don't

6    track those things that closely.  It's not

7    to say that we -- you know, that there

8    aren't other people that could find that

9    out.  From where I -- from my vantage point

10   or from my responsibilities, it was

11   immaterial to me what vehicles it went on.

12   So I didn't spend much time digesting or

13   retaining that information.

14       Q.    I understand.  But your testimony

15   is that at some level in the company, that

16   knowledge would have been available that

17   these products are used on, for example, in

18   this case, Mountaineers and Explorers?

19       A.    I -- I -- I don't know that.  I

20   mean, I think that would be available.

21   Whether anybody took the time to find that

22   out, I don't know that.

23       Q.    Who else at Pontiac should I ask

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 35

1    for that information?

2              And let me just -- let me just

3    withdraw that question and just phrase it

4    this way:  Would there be documents in

5    existence at Pontiac that would include

6    that information?

7         A.    No.

8         Q.    Okay.  How is it that the company

9    would know that?

10        A.    General information, I don't

11   know.  Whether it's an automotive news or a

12   -- you know, a tie-in -- I mean, the

13   platforms eventually get names, and I'm

14   sure there's public documentation out there

15   which would link the two.  I don't know

16   that.  I mean, I'm assuming that.

17        Q.    Was -- since Admiral was not a

18   house account but instead was one that was

19   serviced by Turner & Associates, how did

20   that business first come about with

21   Admiral?

22        A.    I -- I don't know the origin of

23   how the original contact was made.

Page 36

1        Q.    All right.  Is the -- is the

2    brake transmission shift interlock solenoid

3    business with Admiral, is that on a

4    per-contract basis, or is it a low-bidder

5    job, or how does that come about?

6        A.    We -- I mean, I -- I don't know

7    that as well.  We were given a request for

8    quote to design -- or to quote a product to

9    fit this general application.  We supplied

10   the bid and was awarded the job.  So I

11   don't know how -- what criteria that used

12   for determining that.

13       Q.    So way back at the bid stage, you

14   would've had to know things like volume?

15       A.    Right.

16       Q.    Because that will affect the bid

17   price and also the production capability?

18       A.    That's correct.

19       Q.    Right.  Give me an idea of the

20   production volume for the solenoid in this

21   case.

22       A.    Oh, I don't know that I recall

23   that.  I -- I would be guessing, and I'm

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 37

1    going to say in the couple hundred thousand

2    units a year range.

3          Q.    For how many years?

4          A.    Could've been three, could've

5    been five, depending on whatever length of

6    contract our customer was given from their

7    customer.

8          Q.    So if we're looking at a couple

9    of hundred thousand a year for three to

10   five years, we're talking about 600,000 to

11   a million units?

12            MR. BALD:    Object to the form of

13   the question.

14         Q.    (BY MR. ANDREWS)    Is that

15   correct?

16            MR. McGIBONEY:    Object to the

17   form.

18         Q.    (BY MR. ANDREWS)    As best you can

19   answer.

20         A.    I mean, I guess doing the math,

21   yeah, that would make sense.

22         Q.    And what is your understanding

23   and purpose of the brake transmission shift

Page 38

1    interlock?

2        A.   It is a device that inhibits the

3    driver from getting the car out of park

4    without their foot on the brake.

5        Q.   Do you know why that vehicle is

6    -- why that product is included in

7    passenger vehicles?

8        A.   I understand there was some

9    lawsuits back in the early '80s with Audi

10    that spawned this industry for us -- or

11    this product.  They have cars getting out

12    of park without people having their foot on

13    the brake.

14            MR. McGIBONEY:  Object to the

15    form.

16        Q.  (BY MR. ANDREWS)  So do you

17    understand, then, that there is a safety

18    implication involved in the product?

19            MR. BALD:  Object to the form.

20            MR. McGIBONEY:  Object to the

21    form.

22        Q.  (BY MR. ANDREWS)  There is

23    nothing wrong with that.  You can answer.

Page 39

1              MR. McGIBONEY:  Same objection.

2        Q.   (BY MR. ANDREWS)  Go ahead.

3        A.   I guess, yes, I understand that

4   if a vehicle got out of park by any means

5   that wasn't controlled by the driver, that

6   there's a safety implication.

7        Q.   Right.  And as you said, the

8   brake transmission shift interlock is the

9   means by which the vehicle is prevented

10  from being removed from park without the

11  pressing of the brake?

12             MR. BALD:  Object to the form of

13  the question.

14             MR. McGIBONEY:  Same objection.

15       A.   Yes.

16       Q.   (BY MR. ANDREWS)  All right.

17  Where is Jack Corley located today?

18       A.   I believe in Birmingham.  I'm

19  sorry.  In Birmingham, Michigan.

20       Q.   All right.  Do you know where

21  he's employed?

22       A.   I don't know that he is employed.

23  This isn't recent.

Page 40

1      Q.   Do you know why you would've been

2   selected to come today as opposed to

3   Mr. Gidley?

4      A.   Mr. Gidley's tenure is rather

5   short. I have more company product and

6   customer background and knowledge than he

7   would.

8      Q.   How long has he been there?

9      A.   Since November.

10      Q.   What part of November?

11      A.   Late November, early December.

12      Q.   Possibly --

13      A.   After Thanksgiving time frame.

14      Q.   Okay. So when he gave an

15   affidavit on the 19th of December, he had

16   been there for maybe not quite a month?

17      A.   I believe so, yeah.

18      Q.   Who are some of the auto

19   manufacturers that utilize BTSI component

20   parts manufactured by Pontiac Coil?

21      MR. BALD: Object to the form of

22   the question. Assumes facts not in

23   evidence.

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 41

1        A.    I -- the vehicle manufacturers?

2        Q.    (BY MR. ANDREWS)    Yes.

3        A.    Can you restate the question?

4        Q.    Yes, sir.    Well -- and to break

5    it down a little bit, when you gave the bid

6    for the solenoid in this case, you knew it

7    was ultimately going to wind up in a Ford

8    vehicle?    We've established that already?

9        A.    (Witness nods head

10    affirmatively.)

11            MR. BALD:    Object to the form.

12        Q.    (BY MR. ANDREWS)    Okay.    So you

13    knew that the parts --

14            MR. BALD:    Let me -- I'm not sure

15    that was his testimony.    At the time of the

16    bid process.

17            THE WITNESS:    Right.

18        Q.    (BY MR. ANDREWS)    At the time of

19    the -- well, at the time of the bid

20    process, weren't you given volume?

21        A.    We were given volume.    I don't

22    know that we were given platforms.

23        Q.    Okay.    But you knew it was a

**MERRILL LEGAL SOULTIONS**
**Court Reportiong*Legal Videography*Trail Services**

Page 42

1    Ford?

2        A.    I don't know that -- that that's

3    true.

4        Q.    All right.  At some point prior

5    to production, would you have known it was

6    a Ford vehicle?

7        A.    Possibly.

8        Q.    Okay.  But definitely at some

9    point during production, you learned that

10   it's a Ford vehicle that this part is used

11   in?

12       A.    Yes.

13       Q.    Okay.  Now, other than Ford, are

14   there other vehicle manufacturers that

15   utilize component parts manufactured by

16   Pontiac Coil?

17       A.    Yes.

18       Q.    Who are they?

19       A.    Our products go on Chryslers, go

20   on General Motors vehicles, go on Honda

21   vehicles, ultimately -- GM, Chrysler --

22   Audis.  I think that's pretty much all of

23   it.  That's pretty much all of it.

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 43

1        Q.    Okay.   The Ogura company --

2        A.    Yes.

3        Q.    -- what manufacturers do they

4    sell to?

5        A.    They sell to Delphi, and they

6    sell to Visteon, to my knowledge.   I don't

7    know -- at least our products go through

8    them to those customers.   I don't know what

9    other manufacturers they would sell to.

10       Q.    You don't know where it goes

11   downstream from there?

12       A.    On our product, I do.   I don't

13   know what other customers they have.

14       Q.    I understand.   Specifically

15   restricting your answer to your products,

16   though --

17       A.    Uh-huh.

18       Q.    -- are there any Japanese

19   manufacturers that utilize your component

20   products?

21       A.    Honda.

22       Q.    Anyone else?

23       A.    I think that's it.

**MERRILL LEGAL SOULTIONS**
**Court Reportiong*Legal Videography*Trail Services**

Page 44

1          Q.    Okay.  Do you know if Pontiac

2    Coil parts are utilized in Hyundai

3    vehicles?

4          A.    I don't know that.

5          Q.    In terms of advertising done by

6    Pontiac Coil, tell me what sort of

7    advertising is done.

8          A.    Pontiac Coil doesn't do any

9    advertising.

10         Q.    You are aware the company

11   maintains a website?

12         A.    Yes.

13         Q.    All right.  Who -- who maintains

14   the website for you?

15         A.    It was Jack Corley and our IT

16   department.  Mostly through Jack, I think,

17   the content, and then maybe an outside

18   service.  I don't know that it goes through

19   our IT department.

20         Q.    And Jack was the --

21         A.    Sales manager.

22         Q.    -- sales manager?

23         A.    Yes.

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 45

1          Q.    What was the purpose of the

2    website then?

3          A.    For an understanding of anyone

4    looking to find out about Pontiac Coil,

5    what type of products we make.

6          Q.    Used as an advertisement?

7               MR. BALD:  Object to the form.

8               MR. McGIBONEY:  Object to the

9    form.

10          A.    I guess, in a broad sense, yes.

11          Q.    (BY MR. ANDREWS)  Okay.  And that

12    was maintained in-house there at Pontiac

13    Coil?

14          A.    It -- I think it was a third

15    party.  I mean, we -- once every few years,

16    we would give an update to that third

17    party, and they would make the additions,

18    corrections, changes, whatever to the

19    website.  It was not an active -- you know,

20    where we change it daily or --

21          Q.    Who was that third-party company?

22          A.    I don't know that.

23          Q.    Would Jack know that?

**MERRILL LEGAL SOULTIONS**
**Court Reportiong*Legal Videography*Trail Services**

Page 46

```
 1          A.    Jack would've known it, yes.

 2          Q.    Okay.  Have you ever seen

 3    statistics regarding website activity for

 4    the Pontiac Coil website?

 5          A.    No.

 6          Q.    Do you know if Jack would have

 7    that information?

 8          A.    Possibly.  I don't know that.

 9          Q.    So you don't know in terms of the

10    number of hits --

11          A.    No.

12          Q.    -- per day or by region or state?

13          A.    No.

14          Q.    So you're not the person to

15    answer those questions?

16          A.    That's correct.

17          Q.    As far as you know, that would be

18    Jack?

19          A.    That's correct.

20          Q.    Would there be anyone else at

21    Pontiac Coil that would be in a better

22    position?

23          A.    I -- no.  I don't believe so.
```

**MERRILL LEGAL SOULTIONS**
**Court Reportiong*Legal Videography*Trail Services**

Page 47

1       Q.    Okay.  Has Pontiac Coil ever

2    produced a catalog?

3       A.    I believe we've put our name on

4    the catalog that we purchased for standard

5    products when we bought Liberty Control.  I

6    think we just took their logo off and put

7    ours on.

8       Q.    And that make sense because you

9    just continued to manufacture those

10   products, correct?

11      A.    That's correct.

12      Q.    Okay.  Where would that catalog

13   be sent?

14      A.    I don't know that it -- it got

15   sent anywhere.  If a salesperson was into

16   an account that might request that, they

17   would hand it to them, but there was not

18   any mass mailings or any distribution.  We

19   don't print catalogs and distribute them or

20   mail them.

21      Q.    Does Pontiac Coil ever

22   participate in trade shows?

23      A.    No.

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 48

1        Q.    Okay.   Now, in terms of warranty

2    work, if there were a claim that came into

3    Pontiac Coil from, in this case, Visteon

4    regarding some sort of warranty work -- has

5    that ever happened?

6        A.    We wouldn't get a warranty claim

7    back from Visteon in this case.

8        Q.   ·Where would you get a warranty

9    from?

10        A.    We would get it from Admiral, if

11    there was one.

12        Q.    Okay.

13        A.    They are our customer.

14        Q.    All right.  So if, ultimately, a

15    warranty claim arose out in the field in a

16    Ford vehicle, then that would go back up

17    the chain through Visteon, to Admiral, back

18    to Pontiac?

19        A.    That's correct.

20        MR. BALD:  Object to the form of

21    the question.

22        A.    I would assume so.  I believe

23    that's the chain.  I don't --

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 49

1          Q.     (BY MR. ANDREWS)   Are you aware

2     of warranty claims involving Pontiac Coil

3     products?

4          A.     Yes.

5          Q.     Specifically involving brake

6     transmission shift interlock solenoids?

7          A.     Over the past 12 years, yes.

8          Q.     All right.  Give me an idea of

9     some of the warranty claims that Pontiac

10    Coil has dealt with in brake transmission

11    shift interlock solenoids.

12         A.     We've had an occasion here or

13    there where a -- on a -- or on a floor

14    shifter, when the -- when the product came

15    back to us and we analyzed the -- or, you

16    know, did our analysis of the cause of the

17    failure, oftentimes there isn't a problem

18    with the -- with the part when it comes

19    back to us.  So just because it's a

20    warranty claim coming through the system

21    back to Pontiac Coil does not necessarily

22    mean it's a defective part, okay?  It

23    could've been other components within the

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 50

1    system that it was taken off the vehicle

2    for, and no trouble identified is a pretty

3    common analysis of a -- of a part when it

4    comes to warranty claim.  On occasion,

5    we've had one or two that may have come

6    back from a shifter manufacturer, floor

7    shifter that had Coke or sticky

8    contaminants in it that caused the failure.

9         Q.    Which would just impede the

10   operation of the -- the movement of the

11   solenoid?

12        A.    That's correct.

13        Q.    Okay.  And the solenoid is a

14   component part that is integrated into the

15   brake transmission shift interlock?

16        A.    Yes.

17              MR. McGIBONEY:  Object to the

18   form.

19        A.    In some cases.

20        Q.    (BY MR. ANDREWS)  In this case

21   specifically?  I mean, did -- Pontiac did

22   not manufacture the entire brake

23   transmission shift interlock, did you?

Page 51

1       A.    We manufactured the solenoid that

2  connected to other components, which causes

3  the shifter from being inhibited.

4       Q.    So in this case, if -- if a

5  warranty claim arose in the field from

6  Ford, traveled back up ultimately to

7  Pontiac, what part would you be testing

8  specifically?

9       A.    Just the solenoid.

10      Q.    I'm just making sure that I

11 understand what you were saying awhile ago,

12 that if a -- if a complaint arose regarding

13 the operation of the shift interlock, you

14 would not be looking at the overall shift

15 interlock system; you would only be looking

16 at the solenoid?

17          MR. BALD:   Object to the form.

18      A.    I believe we've done both.  We

19 request to be a part of the disassembly and

20 see how it integrates into the system

21 because oftentimes there could be evidence

22 there to indicate what the cause of the

23 failure was, not necessarily with our

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 52

1    solenoid or not.

2        Q.   (BY MR. ANDREWS)   Are you aware

3    of warranty claims involving the solenoid

4    utilized in the vehicle in this case?

5        A.   I'm not aware of any.

6        Q.   All right.   Were you involved in

7    the investigation into the Earlywine case

8    in California?

9        A.   No, sir.

10       Q.   Were you aware of that case at

11   all?

12       A.   No.   (Witness shakes head

13   negatively.)

14       Q.   All right.   Have you read any

15   depositions or anything in this case?

16       A.   No, I have not.

17       Q.   Okay.   In the deposition of the

18   corporate rep from Ford in this case, we

19   learned about at least one other similar

20   incident, and it's arguable at this point

21   whether or not Ford will agree to the

22   similarity, but ultimately we've been told

23   that there was a wiring issue that impeded

Page 53

1    the operation of the solenoid.  Is it your

2    testimony you weren't aware of that

3    incident?

4         A.    That's correct.

5              MR. McGIBONEY:  Object to the

6    form.

7         Q.   (BY MR. ANDREWS)  Okay.  Did you

8    know the Pontiac Coil website is accessible

9    from customers in Alabama?

10        A.   I would assume it's available to

11   anybody worldwide.

12        Q.   Including people in Alabama?

13        A.   Yes.

14        Q.   I'm sorry?

15        A.   Yes.

16             MR. ANDREWS:  Let's take a quick

17   break.

18             THE VIDEOGRAPHER:  We're going

19   off the record at 9:43 a.m.

20             (Break taken.)

21             THE VIDEOGRAPHER:  We are back on

22   the record at 9:50 a.m.

23        Q.   (BY MR. ANDREWS)  Mr. George,

Page 54

1    when did you come down to Alabama?

2         A.    Yesterday afternoon.

3         Q.    Well, I'm going to do my best to

4    get you out of here soon, okay?

5         A.    Yesterday after -- no, I'm sorry,

6    Wednesday afternoon.  What's today, Friday?

7    Wednesday evening.  Wednesday evening.

8         Q.    So yesterday you worked with the

9    lawyer to prepare for today?

10        A.    I spoke with him, yes.

11        Q.    All right.  Is it your

12   testimony -- and I want to be sure that I

13   understand it -- that as far as you know,

14   Pontiac Coil did not deal directly with

15   Ford?

16        A.    That's correct.

17             MR. BALD:  Object to the form.

18   I'm just not sure what you mean by the term

19   "deal."

20        Q.    (BY MR. ANDREWS)  Well, let's

21   broaden that term up, then.  Since your

22   lawyer apparently wants to massage it a

23   little bit, let's -- let's broaden that up.

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 55

1            MR. BALD:  I don't want to

2    massage it.  I want to make sure it's a

3    precise question.

4        Q.   (BY MR. ANDREWS)  Okay.  Well, in

5    as broad a sense as you'd like to use the

6    word, in dealings with Ford Motor Company,

7    did Pontiac Coil have direct interaction

8    with Ford Motor Company regarding

9    solenoids?

10       A.   To the best of my knowledge, no.

11       Q.   Is there anyone else at Pontiac

12   Coil that would have more information than

13   you regarding interaction with Ford Motor

14   Company?

15       A.   I don't know that.

16       Q.   If you had to tell me somebody to

17   talk to, who would that be?

18       A.   I don't know of anybody that

19   would have other information.

20       Q.   All right.  Would Mr. Corley

21   maybe have that information?

22       A.   I don't know that.

23       Q.   Would he deal directly with Ford?

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 56

1          A.    I don't believe so.   I don't know

2     that.

3          Q.    As far as you know, would Turner

4     & Associates or the other company in Dayton

5     deal directly with automobile

6     manufacturers?

7          A.    As far as I know, no.

8          Q.    As far as you know, has Pontiac

9     Coil ever been sued in the State of

10    Alabama?

11         A.    As far as I know, no.

12         Q.    As far as you know, has Pontiac

13    Coil been sued for allegations regarding

14    either operational or manufacturing defects

15    in solenoid assemblies?

16         A.    To my knowledge, we've never been

17    sued.

18         Q.    This is the first lawsuit?

19         A.    That's correct.

20         MR. ANDREWS:  Do you have any

21    questions, Brad?

22         MR. McGIBONEY:  Are you done?

23              ·    MR. ANDREWS:  For now.

**MERRILL LEGAL SOULTIONS**
**Court Reportiong*Legal Videography*Trail Services**

Page 57

1                MR. McGIBONEY:  I don't have any

2       questions.

3                MR. ANDREWS:  Irene?

4                MS. BLOMENKAMP:  No.

5                MR. BALD:  Just a couple of

6       things to clarify.

7

8       EXAMINATION BY MR. BALD:

9            Q.   Mr. Andrews asked you some

10      questions earlier about Mike Gidley, and he

11      referred to Mr. Gidley's affidavit.  Have

12      you reviewed Mr. Gidley's affidavit?

13           A.   Yes, I have.

14           Q.   Okay.  Do you agree with

15      everything that is stated in his affidavit?

16           A.   Yes, I do.

17           Q.   Okay.  And just to be clear,

18      Pontiac Coil does not make brake

19      transmission system interlocks?

20           A.   That's correct.

21           Q.   Okay.  We just make the solenoids

22      that are incorporated into them?

23           A.   That's also correct.

Page 58

1          Q.    Mr. Andrews asked you some

2    questions about warranty work and warranty

3    claims.   Are you aware of any warranty

4    claims that involve this product that we're

5    here about today?

6          A.    None whatsoever.

7          Q.    Okay.  If a customer, say an

8    individual in Alabama, wanted to purchase a

9    solenoid from Pontiac Coil, could they do

10   that?

11         A.    No.

12         Q.    And describe for me why that is.

13         A.    We don't sell on the direct

14   market to anybody any of our products, and

15   in specific applications such as this or 95

16   percent of the product we make, we provide

17   them to our customer whom would be, you

18   know, an air-conditioning clutch coil or a

19   -- or a shifter assembly or column assembly

20   manufacturer.   They have the sole right to

21   buy that from us.  We're not allowed to

22   sell it to anybody else.  So it would have

23   to go through them.  The equipment, the

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 59

1    tooling, all of that is owned by them.  The

2    purchase orders come through them, and we

3    are, I guess, effectively not allowed to

4    sell to anybody else --

5        Q.    Okay.

6        A.    -- their product.

7        Q.    And Mr. Andrews asked you some

8    questions about automakers, and you

9    testified that there is a number of

10   automakers to your knowledge that use

11   Pontiac Coil products?

12       A.    That our products end up on, yes.

13       Q.    And that's what I was getting at.

14       A.    Yes.

15       Q.    Do we sell -- does Pontiac Coil

16   sell directly to an auto manufacturer?

17       A.    In no cases do we sell -- we are

18   currently working with General Motors on a

19   new development program, which would be our

20   first, quote, tier one, unquote,

21   application where we'd work directly with

22   an OEM.

23       Q.    But as we sit here today, that

Page 60

1      has never happened?

2           A.    That's correct.

3           Q.    On the website, it's my

4      understanding from some things that have

5      been filed in the case, there is a link

6      that you can click on on the website that

7      will take you to a distributor?

8           A.    Yes.

9           Q.    Who -- who is that?

10          A.    Digi-Key.

11          Q.    And what is -- who is Digi-Key?

12          A.    Digi-Key is a -- I guess I'd call

13     them a catalog or a distributor of a

14     variety of products similar to a

15     McMaster-Carr or a -- you know, it's a --

16     it's a catalog which some companies have

17     that would have a variety of, you know,

18     thousands of different products and

19     different manufacturers.

20          Q.    What is their relationship to

21     Pontiac Coil?

22          A.    We sell our standard products to

23     Digi-Key, our standard products being that

**MERRILL LEGAL SOULTIONS**
**Court Reportiong*Legal Videography*Trail Services**

Page 61

1    catalog that -- set of products that we

2    purchased, we sell that to Digi-Key for

3    distribution to individuals and/or

4    companies.

5         Q.    Is Digi-Key in any way affiliated

6    with Pontiac Coil?

7         A.    Not at all.  We have a

8    contractual relationship to sell through

9    them and them only.

10        Q.    Are they an independent company?

11        A.    I believe so.

12        Q.    Okay.

13        A.    They're not affiliated with us or

14   related to us, if that's what you mean.

15        Q.    Okay.  Okay.  Where are Pontiac

16   Coil's existing facilities?

17        A.    We have the manufacturing and --

18   facility and headquarters in Clarkston,

19   Michigan.  We have a manufacturing facility

20   in Searcy, Arkansas, and we have a complete

21   operation in Nottingham, England.

22             MR. BALD:  That's all the

23   questions I have.

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 62

1

2    RE-EXAMINATION BY MR. ANDREWS:

3        Q.    Going back and actually following

4    up what you and I talked about earlier and

5    what you've just talked about with your

6    lawyer, you gave me a list early on of

7    outside companies, including Delphi and

8    Behr and Eaton.  You remember that?

9        A.    Uh-huh.

10       Q.    Okay.  Have you looked at the

11   Pontiac Coil website?

12       A.    Not recently.

13       Q.    All right.  Well -- and we can

14   attach it if we need to.  Do you remember

15   seeing a list of those outside companies on

16   the website?

17       A.    No.  That one, I don't.  I

18   don't -- I don't monitor our website.  I

19   don't look at our website.  I really have

20   not -- that was handled through our sales

21   departments.  Off record?  Do you have a

22   paper clip that's fine over kill.

23                (Whereupon, Exhibit No.

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 63

1            Plaintiff's was marked for

2            identification.)

3       Q.   (BY MR. ANDREWS)  Let me show you

4  what I've marked as Exhibit 1.  Just take a

5  second.  Do you recognize what that

6  document is?

7       A.   It appears to be a screen shot of

8  our website.

9       Q.   And, specifically, it's a screen

10 shot that is entitled what?

11      A.   Directing movement.

12      Q.   What does that mean?

13      A.   That is our -- I guess our tag

14 line for the type of products we -- or what

15 our concept of the type of environment we

16 live in.  I mean, Pontiac Coil directs

17 movement with our products --

18      Q.   Okay.

19      A.   -- in all varieties,

20 shapes, and --

21      Q.   And those products would be

22 directed to those people that are on that

23 list?

2100 3rd Avenue North, Suite 960*Birmingham, Al 35203*
1-800-888-DEPO

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 64

1          A.     Not necessarily.

2          Q.     Okay.  Because that list includes

3     Delphi and Behr and Eaton, but it also

4     includes Ford Motor Company, doesn't it?

5          A.     Uh-huh.

6          Q.     I'm sorry?

7          A.     Yes.

8          Q.     And a second ago when your lawyer

9     asked you this question about Digi-Key, and

10    you said that that's just an arrangement by

11    which the standard product catalog items

12    are shared with Digi-Key or licensed

13    exclusively to Digi-Key's, correct?

14         A.     I didn't say licensed.  I don't

15    know the arrangement.  I do know that they

16    are the sole distributor for us for that

17    product.  I mean, we have this standard

18    product we sell to them, to them only.

19    They take care of the individual customers,

20    onesy, twosies that want to buy product

21    from us.

22         Q.     For the standard product?

23         A.     For the standard product.

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 65

1          Q.    Okay.   But we've established in

2     this case we aren't dealing with standard

3     product?

4          A.    That's correct.

5          Q.    We're dealing with a product

6     that's manufactured for a specific use for

7     a specific customer?

8          A.    That's correct.

9          Q.    If Pontiac Coil is, in this case,

10     trying to distance itself from Ford Motor

11     Company, why would Ford be listed on

12     Pontiac Coil'S website?

13          MR. BALD:   Object to the form of

14     the question.

15          MR. McGIBONEY:   Object to the

16     form.

17          A.    These are end-use customers for

18     our products.   That's what I perceive from

19     this.   I didn't create this.   I

20     don't -- I don't understand -- you know, I

21     don't know what determination was used to

22     list these customers.

23          Q.    Mr. Corley would be the one to

Page 66

1    talk to?

2        A.    I would think he would have that

3    answer.  I don't know that.

4            MR. ANDREWS:  All right.  Do you

5    have anything else?

6

7    RE-EXAMINATION BY MR. BALD:

8        Q.    Just looking at Exhibit 1, this

9    is the website screen shot, directing

10   movement, it doesn't identify these various

11   entities as customers, does it?

12       A.    No, it doesn't.

13       Q.    Okay.  It simply states directing

14   movement forward, colon, and then it lists

15   a number of different entities, correct?

16       A.    That's correct.

17       Q.    That is Eaton, Delphi, Ford, and

18   Behr, and a number of others, correct?

19       A.    That's correct.

20       Q.    And you've already testified that

21   you are aware that for this specific

22   product we're here to talk about today, the

23   solenoid, that inevitably and eventually,

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 67

1    that solenoid would pass its way through

2    Admiral, Visteon, and eventually to Ford?

3        A.    That's correct.

4            MR. BALD:  Okay.  That's all the

5    questions I have.

6            THE VIDEOGRAPHER:  Does anyone

7    have any further questions?

8            All right.  This is the end of

9    tape number one and concludes the video

10   deposition of Ken George taken on February

11   29, 2008.  We're going off the record at

12   10:03 a.m.

13

14    (THE DEPOSITION CONCLUDED AT 10:03 A.M.)

15

16

17

18

19

20

21

22

23

MERRILL LEGAL SOULTIONS
Court Reportiong*Legal Videography*Trail Services

Page 68

```
 1                    CERTIFICATE

 2     STATE OF ALABAMA        )

 3

 4     COUNTY OF JEFFERSON   )

 5

 6          I hereby certify that the above and

 7     foregoing deposition was taken down by me

 8     in stenotype and the questions and answers

 9     thereto were transcribed by means of

10     computer-aided transcription, and that the

11     foregoing represents a true and correct

12     transcript of the testimony given by and

13     witness upon said hearing.

14          I further certify that I am neither

15     of counsel, nor kin to the parties to the

16     action, nor am I in anyway interested in

17     the result of said cause named in said

18     caption.

19

20                         ----------------------

21                         Bridget Stacey McClain

22                         Certified Court Reporter

23                         ACCR #56 - Expires 9/30/08
```



# directing **movement**



**for:**

*Ada Technology, Incorporated*

*American Axle & Manufacturing*

*Behr America*

*BorgWarner*

*Cummins Engine Company*

*DaimlerChrysler Corporation*

*Delphi*

*Dura Automotive*

*Eaton*

*Ficosa International*

*Ford Motor Company*

*General Motors Corporation*

*GHSP*

*Numatics, Inc.*

*Owens Illinois*

*Paulstra*

*Robert Bosch Company*

*Teleflex Automotive*



**PLAINTIFF'S EXHIBIT**

Coil :: directing movement

*USUI International*

*ZF Lemforder*

*and more...*

Home  |  About  |  Capabilities  |  Products  |  Suppliers  |  Contact