IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

MEREDITH CHADWICK RAY and PHILIP            )
RAY,                                         )
                                             )
                Plaintiffs,                  )
                                             )
                                             )  CIVIL ACTION NO. 3:07-cv-175-WHA
v.                                           )
                                             )
FORD MOTOR COMPANY, PONTIAC                  )
COIL, INC.; VISTEON CORP., et al.,           )
                                             )
                Defendants.                  )

## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

This cause is before the court on a Motion to Dismiss for lack of personal jurisdiction filed by Defendant Pontiac Coil, Inc., ("Pontiac Coil"). (Doc. # 35.)  The Plaintiffs, Meredith Chadwick Ray and Philip Ray (together, "the Rays"), filed a complaint against Ford Motor Company ("Ford") on February 27, 2007 (Doc. # 1), and filed an Amended Complaint on October 15, 2007, adding Defendants Pontiac Coil and Visteon Corporation. (Doc. # 27.)  The case is in federal court on diversity jurisdiction pursuant to 28 U.S.C. § 1332, as there is currently no dispute as to complete diversity between the parties or the amount in controversy. The cause of action arises out of an automobile accident that occurred on April 21, 2006 in Lee County, Alabama.  Pontiac Coil manufactured the solenoid that was incorporated into the brake transmission interlock of the Ford vehicle.

Pontiac Coil filed its Motion to Dismiss on November 26, 2007, arguing that it lacks the minimum contacts with Alabama necessary for the court to exercise personal jurisdiction.  The

1

court gave Pontiac Coil time to supplement its motion with supporting evidence. Pontiac Coil filed a Brief in Support of their Motion to Dismiss ("Br. in Supp."), and the Rays filed a Brief in Opposition ("Br. in Opp."), arguing that Pontiac Coil had sufficient contacts with Alabama, and alternatively moving for a stay until additional discovery could be completed.

The court granted the motion for a stay of Pontiac Coil's motion to dismiss pending additional discovery, and set the issue for oral argument. After oral argument, the court granted the Rays' motion for jurisdictional discovery and held the Motion to Dismiss in abeyance. The parties were directed to complete discovery and file any supplemental briefs by March 17, 2008, a deadline which was later extended to May 1, 2008. The Rays filed a supplemental brief in opposition ("Supple. Br. in Opp.") and Pontiac Coil filed a supplemental brief in support of its Motion to Dismiss ("Supple. Br. in Supp.").

## II. STANDARD OF REVIEW

The court allowed time for discovery, and the motion was submitted on evidence and briefs. No evidentiary hearing was held. In the context of a motion to dismiss for lack of personal jurisdiction in which no evidentiary hearing is held, the plaintiff bears the burden of establishing a prima facie case of jurisdiction over the movant, non-resident defendant. *Morris v. SSE, Inc.*, 843 F.2d 489, 492 (11th Cir. 1988)(citations omitted). A prima facie case is established if the plaintiff presents sufficient evidence to defeat a motion for a directed verdict. *Morris*, 843 F.2d at 492. The court must construe the allegations in the complaint as true, to the extent they are uncontroverted by defendant's affidavits or deposition testimony. *Id.* (citations omitted). Moreover, where the evidence presented by the parties' affidavits and deposition testimony conflicts, the court must construe all reasonable inferences in favor of the non-movant

2

plaintiff. *Delong Equip. Co. v. Washington Mills Abrasive Co.*, 840 F.2d 843, 845 (11th Cir. 1988).

## III. FACTS

The pleadings and evidence submitted establish the following facts:

On April 21, 2006, Meredith Chadwick Ray ("Meredith") exited her 2002 Mercury Mountaineer and left the vehicle parked with the engine running. She alleges that because the "park interlock (brake transmission shift interlock)" failed to operate properly, the vehicle moved into gear from its parked position and struck her, pinning her against the building wall causing numerous injuries including the amputation of her leg.

Pontiac Coil is a foreign corporation with its principal place of business in Clarkston, Michigan. Pontiac Coil designs and manufactures solenoid assemblies, components of the brake transmission shift interlock ("BTSI") system, which is designed to prevent the driver from getting the car out of park without putting his or her foot on the brake. (Supple. Br. in Opp. at 2; George Depo. 38:2-4.) Pontiac Coil concedes that it manufactured the solenoid at issue and sold it to Admiral Tool & Manufacturing Co. of Michigan ("Admiral"), which incorporated the solenoid into an automotive component and sold the component to Visteon Corporation ("Visteon"), which then sold the component to Ford, which manufactured and sold the vehicle. (Supple. Br. in Supp. at 1-2.)[1] Pontiac Coil does not advertise in Alabama, has no facilities in

---

[1] Whereas the Amended Complaint added Pontiac Coil and Visteon as co-defendants along with Ford, Visteon filed a third-party complaint against Admiral. (Doc. # 70.) All participants in the chain of supply from the manufacturing of the solenoid to its placement in the manufacture of the vehicle, therefore, are parties to the case.

Alabama, conducts no business in Alabama, and has no employees, agents, accounts, or customers in Alabama. (*Id.* at 3.)

## IV. DISCUSSION

To determine whether specific personal jurisdiction[2] exists, the court must look at the applicable state long-arm statute and the federal due process requirements. *Cronin v. Nat'l Ins. Co.,* 980 F.2d 663, 670 (11th Cir. 1993) (*citing Pesoplastic C.A. v. Cincinnati Milacron Co.,* 750 F.2d 1516, 1521 (11th Cir. 1985)). Alabama's long-arm statute permits personal jurisdiction to the extent allowed by the United States Constitution. Ala. R. Civ. P. 4.2(a)(2); *see Martin v. Robbins,* 628 So. 2d 614, 617 (Ala. 1993). "When the courts of the forum State have interpreted the forum's long-arm statute to confer jurisdiction to the limits allowed by federal due process, state law need not be applied: [the court] need only ask whether the exercise of jurisdiction over the nonresident defendant comports with due process." *Vermeulen v. Renault U.S.A., Inc.,* 975 F.2d 746, 753 (11th Cir. 1992).

The Due Process Clause "protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he or she has established no meaningful 'contacts, ties or relations.'" *Marbury v. Am. Truetzschler.,* 111 F. Supp.2d 1281, 1283 (M.D. Ala. 2000) (Dement, J.) (*quoting Int'l Shoe Co. v. Washington,* 326 U.S. 310, 319 (1945)). An analysis of due process involves a two-step process: first, the court must determine whether the defendant has "sufficient minimum contacts with the forum state"; second, the court must consider whether

---

[2]  Although there are two types of personal jurisdiction – general and specific – the parties only dispute as to whether this court has specific personal jurisdiction over Pontiac Coil, presumably agreeing, as does this court, that there is no general jurisdiction because there are insufficient "continuous and systematic contacts." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 411-15 (1984).

4

exercising personal jurisdiction would offend "traditional notions of fair play and substantial

justice." *Vermeulen,* 985 F.2d 1534, 1545 (11th Cir. 1993) (*quoting Int'l Shoe*, 326 U.S. at 316).

 This two part test "embodies the controlling due process principle that a defendant must have

'fair warning' that a particular activity may subject it to the jurisdiction of a foreign sovereign."

*Id.* (*quoting Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).

### 1. Sufficient minimum contacts

To have "constitutionally minimum contacts, the defendant's contacts with the forum

must (1) be related to the cause of action or have given rise to it; (2) involve "some act by which

the defendant purposefully avails itself of the privilege of conducting activities within the forum

. . . thus invoking the benefits and protections of its laws; and (3) be "such that [the defendant]

should reasonably anticipate being haled into court there." *Id.* at 1546 (internal quotation marks

and citations omitted).

### a. Contacts related to the cause of action

In determining the constitutional significance of the defendant's minimal contacts with

the forum, the court first must determine that the contacts are "related to the plaintiff's cause of

action or have given rise to it." *Id.*; *see id.* at 1550 (finding defendant's activities to be

"inextricable links . . . by which the appellant obtained her vehicle, the product of this liability

suit."). Here, Pontiac Coil designed and manufactured the solenoid assembly present in the

allegedly defective BTSI system, which allegedly caused the vehicle to slip out of park and

injure Ray. As the vehicle is the subject of this cause of action, Pontiac Coil's contacts with

respect to its production of the solenoid assembly in question are sufficiently related to the cause

of action. *Contrast Marbury v. Am. Truetzchler*, 111 F. Supp.2d 1281, 1284-85 (M.D. Ala. 2000)

(Albritton, J.) (finding defendant's contacts with Alabama through its agents regarding training and repair of allegedly defective machines sufficiently related to cause of action) *with Thomas v. Mitsubishi Motor N.A., Inc.,* 436 F. Supp.2d 1250, 1253-54 (M.D. Ala. 2006) (Albritton, J.) (finding e-mail and previous sales contacts between plaintiff's counsel and defendant through defendant's website, unrelated to the transaction between plaintiff and defendant, to be insufficiently related to cause of action).

*b. Purposeful availment of the privilege of conducting business within the forum*

Second, the defendant must have committed "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum . . . thus invoking the benefits and protections of its laws." *Vermeulen*, 985 F.2d at 1546.  The United States Supreme Court explored the contours of minimum contacts in the "stream-of-commerce" context when it held that an Oklahoma court did not have jurisdiction over a New York-based wholesale automobile distributor and its New York retailer, which sold an allegedly defective vehicle to New York residents at a New York store, when the purchasers suffered an accident while travelling through Oklahoma. *See World-Wide Volkswagen, Corp. v. Woodson,* 444 U.S. 286, 297 (1980).  The *World-Wide* court rejected the plaintiffs' argument that foreseeability was sufficient to exercise jurisdiction, holding that "'foreseeability' alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." *Id.* at 295.  Instead, the court held, "the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State.  Rather it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Id.* at 297.  Specifically, the court held:

> If the sale of a product or manufacturer or distributor such as Audi or Volkswagen
> is not simply an isolated occurrence, but arises from the efforts of the manufacturer
> or distributor to serve directly or indirectly, the market for its product in other States,
> it is not unreasonable to subject it to suit in one of those States if its allegedly
> defective merchandise has been the source of injury to its owner or to others. The
> forum State does not exceed its powers under the Due Process Clause if it asserts
> personal jurisdiction over a corporation that delivers its products into the stream of
> commerce with the expectation that they will be purchased by consumers in the
> forum State.

*Id.* at 297-98.

The Supreme Court revisited the issue of minimum contacts in the "stream of commerce"

context in *Asahi Metal Industry Co. v. Superior Court of California*, when an indemnification

action was brought in California by a Taiwanese tire manufacturer against Asahi, a Japanese

manufacturer of the allegedly defective component tire valves. 480 U.S. 102 (1987). Writing

the opinion for a plurality of four Justices[3], Justice O'Connor concluded that Asahi did not have

sufficient minimum contacts because such contacts did not exist when "the defendant acted by

placing a product in the stream of commerce, and the stream eventually swept defendant's

product into the forum State, but the defendant did nothing else to purposefully avail itself of the

market in the forum State." *Id.* at 110 (plurality opinion). Such additional conduct might include

"designing the product for the market in the forum State, advertising in the forum State,

establishing channels for providing regular advice to customers in the forum state, or marketing

the product through a distributor who has agreed to serve as the sales agent in the forum State."

*Id.* at 112 (plurality opinion); *see also Marbury v. Am. Truetzchler*, 11 F. Supp. 2d 1281, 1285

(11th Cir. 2000) (*quoting Asahi*). O'Connor's plurality found no such additional "stream-of-

---

[3] Joining O'Connor in this portion of the plurality were Chief Justice Rehnquist and
Justices Powell and Scalia.

commerce plus" conduct, and therefore that there were insufficient minimum contacts for the California court to exercise personal jurisdiction without violating due process. *Id.* at 113 (plurality opinion).[4]

Concurring in part and concurring in the judgment, Justice Stevens (joined by Justices White and Blackmun) rejected O'Connor's formulation, seeing "no reason in this case for the plurality to articulate 'purposeful direction' or any other test as the nexus between an act of a defendant and the forum State that is necessary to establish minimum contacts. *Id.* at 122 (Stevens, J., concurring). Assuming such formulation were necessary, Stevens wrote, the plurality "seems to assume that an unwavering line can be drawn between 'mere awareness' that a component will find its way into the forum State and 'purposeful availment' of the forum's market." *Id.* Whether conduct rises to the level of purposeful availment, Stevens wrote, "requires a constitutional determination that is affected by the volume, the value, and the hazardous character of the components." *Id.*[5]

---

[4] Alternatively, seven Justices joined in O'Connor's part of the opinion that, even if there were sufficient minimum contacts, the exercise of personal jurisdiction would "offend 'traditional notions of fair play and substantial justice.'" *Id.* at 113 (JJ. Brennan, White, Marshall, Blackmun, Powell, Stevens, O'Connor, and C.J. Rehnquist). "Considering the international context, the heavy burden on the alien defendant, and the slight interests of the plaintiff and the forum State" in this international indemnification action, the Court therefore found no personal jurisdiction, regardless of the splintered decision with respect to minimum contacts. *Id.* at 116. For this reason, Stevens rejected the O'Connor formulation as unnecessary dicta. *Id.* at 121 (Stevens, J.).

[5] As an example, Stephens wrote that he "would be inclined to conclude that a regular course of dealing that results in deliveries of over 100,000 units annually over a period of several years would constitute 'purposeful availment' even though the item delivered to the forum State was a standard product marketed throughout the world." *Id.*

Finally, Justice Brennan concurred in part and concurred in the judgment, but under a minimum contacts formulation broader than either O'Connor's or Stevens's. *Id.* at 116-21 (Brennan, J., concurring in part, joined by White, Marshall, and Blackmun, JJ.). Brennan saw no need, as O'Connor did, for a showing of "additional conduct" directed towards the forum because "the stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." *Id.* at 117. Brennan further wrote that a defendant placing goods in the stream of commerce "benefits economically from the retail sale of the final product in the forum State, and indirectly benefits from the State's laws that regulate and facilitate commercial activity." *Id.* Brennan noted the distinction made in *World-Wide* "between a case involving goods which reach a distant State through a chain of distribution and a case involving goods which reach the same State because a consumer . . . took them there. *Id.* at 120 (internal citations omitted). Brennan would have found it sufficient that "Asahi was aware of the distribution system's operation, and it knew that it would benefit economically from the sale in California of products incorporating its components." *Id.* at 121.

Following *Asahi*, some courts have "declined to follow" the plurality's analysis and continued to apply the "stream of commerce" analysis adopted in *World-Wide Volkswagen. See Vermeulen,* 985 F.2d at 1548 n.17 (citing example cases); *CSX Transp., Inc. v. Preussag Intern. Steel Corp.,* 210 F. Supp.2d 1228, 1234 (M.D. Ala. 2002) ("In the time since the *Asahi* decision was handed down, the Eleventh Circuit has provided no clear guidance as to the appropriate weight to be accorded to the competing stream of commerce theories.") Other courts have either

9

found that sufficient contacts exist under the narrowest O'Connor test or that there were insufficient contacts under the broadest Brennan test, thereby obviating the need to choose among them. *Morris v. SSE, Inc.,* 843 F.2d 489, 493 n.5 (11th Cir. 1988) ("Necessarily, if personal jurisdiction exists under the narrower O'Connor test, it exists under the broader Stevens and Brennan tests."). For the limited purpose of resolving this case, this court applies Justice O'Connor's theory and finds that this court's exercise of personal jurisdiction over Pontiac Coil complies with the Due Process clause of the constitution. *See Vermeulen v. Renault*, 985 F.2d 1534, 1548 (11th Cir. 1993) (finding jurisdiction under O'Connor's test and therefore that the court "need not determine which standard actually controls this case.").

Pontiac Coil argues that it merely placed its solenoid assemblies into the stream of commerce, as they passed through two intermediary suppliers before being incorporated into Ford's cars. Therefore, Pontiac Coil argues that it "has not engaged in any conduct, other than the act of placing solenoids into the stream of commerce, from which it could predict that it could be subject to suit in Alabama." (Supple. Br. in Supp. at 7.)

The Rays claim, however, based on evidence submitted, that Pontiac Coil was "actively involved in monitoring the effectiveness and safety of its product after it was sent to consumers by being involved in the warranty claim process of Ford." (Supple. Br. in Opp. at 7.);(George Depo. 48:10-19, 49:12-52:1). Pontiac Coil designed its solenoid assembly according to a "black box design" incorporating Ford specifications, with knowledge that it would manufacture "hundreds of thousands of these solenoids for Ford to place in its vehicles and distribute throughout the country," even if those specifications were passed down through the intermediate suppliers. (Supple. Br. in Opp. at 8.);(George Depo. 24:9-12; 25:1-29:19; 37:8-21.).

10

The court finds, construing all reasonable inferences in favor of the non-movant as required in a motion to dismiss, that Pontiac Coil has committed acts sufficient to constitute additional conduct under the "purposeful availment" requirement of the O'Connor test. *Id.* Specifically, the court finds that, among the examples of "additional conduct" cited in O'Connor's *Asahi* plurality, that Pontiac Coil (1) designed the product for market in the forum State; and (2) established channels for providing regular advice to customers in the forum State. *Asahi*, 480 U.S. at 112.

First, Pontiac Coil custom designs its products for specific customers. (George Depo. 24:10-12.)[6]  In designing its solenoid assembly, Pontiac Coil was given a quote request for the new program, the vehicle platform it would be used on, and it based its quotes on "projections of that . . . vehicle's sale." (George Depo. 25:19-26:16.)  Although Admiral, not Ford, may have given them the specifications, they were Ford's specifications, and the evidence shows that Pontiac Coil knew that they were designing a product that would be marketed specifically to Ford, that it would be producing between 600,000 and 1,000,000 solenoids for use in Ford cars over the next three to five years, and knew or should have known that Ford markets its cars in every state in the Union, including Alabama. *Id.*  This court therefore finds that Pontiac Coil

---

[6]  Pontiac Coil argues that the solenoid assembly was sold and marketed for Admiral, the first intermediary, and not for Ford.  (Br. in Supp. at 2-3.)  Because Pontiac Coil manufactured the solenoid assembly according to Ford guidelines, intentionally designed it to function with the Ford vehicle's  electrical system and to fit within the Ford vehicle, and ensured that it complied with certain temperature, voltage and range specifications (George Depo. 27:6-29:19), this court finds that the corporate existence of intermediary suppliers may not obscure the evidence that Pontiac Coil's product was designed for Ford vehicles. *Cf. Vermeulen*, 985 F.2d at 1548 ("[A] truly interstate [or international] business may not shield itself from suit by a careful but formalistic structuring of its business dealings."

designed the product for market in Alabama, the forum state where the plaintiff is a resident and where the accident took place.

As evidence of advertising in Alabama, the Rays point to Pontiac Coil's website, which boasts "facilities located throughout North America and Europe," and that it "identifies Ford Motor Company as a company Pontiac Coil does business with." (Br. in Opp. at 2.)  This argument invites the court to make the logical step that, since Pontiac Coil puts itself out as an international company, and identifies Ford as a business client, it has opened itself up to be subject to personal jurisdiction in any state in which Ford does business.[7]  The application of jurisdictional analysis in situations involving the Internet is a developing area of law, and seems to depend, at least in part, on the extent to which the website in interactive in nature. *See Thomas v. Mitsubishi Motor N.A.,* 436 F. Supp.2d at 1253-54; *see generally* 16 Moore's Federal Practice - Civil § 108.44 (2008) ("Application of Jurisdiction Analysis to Situations Involving Internet"). Such analysis is unnecessary in this case, however, because there is no evidence that any business agreement relevant to this case arose from or is in anyway related to the content on Pontiac Coil's website, much less that any online orders were placed by Ford, Admiral, or Visteon; therefore, any contacts arising from the website would not be related to the cause of action in this case. *Thomas,* 486 F. Supp.2d at 1253 ("The email and website evidence presented did not concern the transaction between [plaintiff and defendant], but instead involved plaintiff's counsel and transpired after the accident occurred.").  Although not a relevant attempt to

───────────

[7] Aside from the relevance of Pontiac Coil's website to the cause of action, this argument invites the Court to adopt the broader test adopted by Brennan in *Asahi*.  As discussed above, however, this court applies the O'Connor test for the limited reason that it finds jurisdiction exists under O'Connor's test, and therefore under both of the broader tests as well.

advertise in the forum state, and thus not additional conduct for "purposeful availment" reasons, however, the advertisements on Pontiac Coil's website *do* tend to discredit Pontiac Coil's attempts during litigation to isolate and distance its business activities from Ford through the use of intermediary suppliers.

Finally, Pontiac Coil remained "actively involved in monitoring the effectiveness and safety of its product after it was sent to consumers by being involved in the warranty claim process of Ford." (Supple. Br. in Opp. at 7.)  Warranties would not come directly back to Pontiac Coil from Ford, but would work their way back the chain of distribution until Pontiac received the warranty claim from Admiral. (George Depo. 48:1-19.)  If a warranty claim came back to Pontiac on the BTSI, even if it was ultimately found to be a different component within the BTSI at fault and not the solenoid, Pontiac Coil would request to be part of the disassembly, witness how the solenoid was integrated into the system, and perform engineering analyses on the solenoid itself. (*Id.* at 49:12-23; 51:1-52:1.)  If a warranty claim came from any consumer concerning the BTSI, for example, Pontiac Coil would investigate the claim through testing of the solenoid to determine if there was an actual problem. (Supple. Br. in Opp. at 7.);(George Depo. 48:14-19; 51:4-9.)  In this way, the Rays argue, Pontiac Coil "purposefully availed itself of the benefits and protection of the laws of Alabama by being actively engaged in responding to the needs of consumers using its product." (Supple. Br. in Opp. at 8.)

Although not directly on point, *Morris v. SSE* provides some guidance in determining "additional conduct" under O'Connor's test. 843 F.2d 489 (11th Cir. 1988).  In *Morris*, the Eleventh Circuit held that a company's repair of a device within a parachute was "analogous to designing a product for the forum state" and thus constituted "additional conduct" under the

13

O'Connor test. *Id.* at 493-94 (11th Cir. 1988). The Alabama company shipped the parachute devices to SSE for repair, and the Eleventh Circuit held that because SSE received the devices for repair, repaired them, and returned them back to Alabama, "it cannot be said that [the Alabama company's] unilateral action created SSE's contacts with Alabama." *Id.* at 491, 494.

In *Marbury v. Am. Truetzschler*, another judge of this court found not only that the defendant's design of safety equipment for the client's machines in Alabama was analogous to designing a product for the Alabama market, but also that by regularly providing maintenance advice, repair or replacement parts, company trained service personnel and specific safety advice regarding the subject equipment located in Alabama, they were establishing channels for providing regular advice to customers within the market. 111 F. Supp.2d 1281, 1286 (11th Cir. 2000).

Like the defendants in *Marbury* and *Morris*, Pontiac Coil maintains an ongoing responsibility for its solenoid product once it is released into the stream of commerce, by actively participating in the disassembly of the BTSI and performing analyses to determine whether the solenoid is at fault. By continuing to be nationally responsible as part of a warranty for the performance of the solenoid, Pontiac Coil has established channels of providing services that benefit Ford customers within the forum state of Alabama. Additionally, by maintaining an ongoing warranty responsibility for the performance of the solenoid, whether directly or indirectly, Pontiac Coil benefits from any Alabama laws that may limit the warranty liability of either Pontiac or one of the intermediary suppliers, as well as any Alabama laws that may facilitate commerce and thus increased sales of Ford automobiles and their incorporated Pontiac Coil solenoids. *Asahi*, 480 U.S. at 109 (minimum contacts must have basis in an act which

"purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.").

Unlike in *World-Wide Volkswagen*, where the passage of a New York car purchased in New York and driven by New York residents through Oklahoma was "simply an isolated occurrence," Pontiac Coil's purposeful conduct, by designing the product specifically for a widely known national automaker, by maintaining an ongoing responsibility for the performance of its product, and by thereby invoking the benefits and protections of Alabama laws, arises from its efforts "to serve, directly or indirectly, the market for its product in other States." *World-Wide*, 444 U.S. at 297. Therefore, "it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others." *Id.*

*c. Reasonably anticipate being haled into court there.*

The third prong necessary for constitutionally sufficient minimum contacts is that they must be "such that [the defendant] should reasonably anticipate being haled into court there." *Vermeulen*, 985 F.2d at 1546. In *Ruiz de Molina v. Merritt & Furman Ins. Agency, Inc.,* the Eleventh Circuit held that the defendants could reasonably anticipate being haled into court in Alabama when the defendants did not dispute putting an insurance policy "into the stream of commerce knowing full well that it was to be purchased by and delivered to an Alabama resident for a boat anchored in Alabama which would, of necessity, move in Alabama waters," even though all of their dealings were with a broker in Florida. 207 F.3d 1351, 1356-58 (11th Cir. 2000). In *Olivier v. Merritt Dredging Co., Inc.,* the Eleventh Circuit considered the purposeful availment analysis to contribute to the definition of when a defendant should reasonably

anticipate being haled into court. 979 F.2d 827, 833 (11th Cir. 1992).  The *Olivier* court held that two state insurance guaranty associations from South Carolina and Louisiana, by their very formation under state statute in order to avoid federal legislation creating a national guaranty fund, "had to anticipate that [they] would be haled into the same courts where their insolvent members would have been subject to the reach of due process. *Id.*

Here, Pontiac Coil custom designed its product specifically for Ford cars, knowing that its product would be incorporated into the vehicle (George Depo. 24:11-12; 24:20-25:3; 25:13-17, 27:6-11), and, by virtue of Ford serving the national market, that some of those vehicles would be distributed to Alabama and sold.  In addition, Pontiac Coil maintained certain ongoing warranty responsibilities for its solenoid assemblies even after they had been incorporated into the Ford vehicle and purchased in Alabama.

To the extent that Justice Steven's purposeful availment factors may inform the determination of whether it is reasonable to subject Pontiac Coil to personal jurisdiction in Alabama, the court notes that Pontiac Coil expected to manufacture between 600,000 and 1,000,000 solenoid assemblies designed specifically for Ford cars over the next three to five years, and that a defect in the system that keeps a vehicle in park is an inherently dangerous risk. *See Asahi*, 480 U.S. at 122 (Stevens, concurring in part) (noting that purposeful availment "requires a constitutional determination that its affected by the volume, the value and the hazardous character of the components."); *Morris v. SSE*, 843 F.2d at 494 (finding that because parachuting device fell under Steven's "hazardous product" category, it was "clear that [defendant] was aware that it was sending a hazardous product [to Alabama]).  Pontiac Coil was aware of the dangerous nature of defects in its product because "some lawsuits back in the early

16

'80s with Audi . . . spawned this industry for [Pontiac Coil]." (George Depo. 38:8-11.)  This

court therefore finds that Pontiac Coil could reasonably anticipate that a plaintiff may hale it into

an Alabama court due to an alleged defect with a Ford BTSI system containing one of between

600,000 and 1,000,000 solenoid assemblies created for Ford. *Cf. Marbury*, 111 F. Supp.2d at

1286 ("The court finds that Defendant Temafa should have anticipated that, if the new safety

designs were not sufficient to eliminate the dangerous condition, it could be sued in Alabama.").

### 2. Fair play and substantial justice.

"Once it has been decided that a defendant purposefully established minimum contacts

within the forum State, these contacts may be considered in light of other factors to determine

whether the assertion of personal jurisdiction would comport with 'fair play and substantial

justice.'" *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476 (1985) (*quoting Int'l Shoe Co. V.

Washington,* 326 U.S. 310, 320 (1945)).  Such factors include "the burden on the defendant, the

forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient

and effective relief, the interstate judicial system's interest in obtaining the most efficient

resolution of controversies, and the shared interest of the several States in furthering fundamental

substantive social policies." *Id.* at 477 (*quoting World-Wide,* 444 U.S. at 292) (internal

quotations marks omitted).  As the Supreme Court in *Burger King* held, "[t]hese considerations

sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of

minimum contacts than would otherwise be required." *Id.*; *see also Olivier v. Merritt Dredging

Co., Inc.,* 979 F.2d 827, 834 (11th Cir. 1992) (*quoting Burger King*, 471 U.S. at 477).

In *Olivier,* the Eleventh Circuit found that exercising personal jurisdiction over the

Louisiana and South Carolina insurance guaranty associations comported with fair play and

substantial justice. 979 F.2d at 834.  The court noted that "modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity." *Id.* (*quoting McGee v. Int'l Life Ins. Co.,* 355 U.S. 220, 222-23 (1957)). The court found that requiring adjudication in Alabama would not impose a substantial burden on the defendant insurance guaranty associations, whereas requiring the plaintiff to litigate his claim in two different courts would "spread thin his resources", "hamper his ability to obtain quick, convenient, and effective relief," and "pose an unnecessary waste of precious judicial resources" by requiring duplicative litigation in two different fora. *Id.*

In *Marbury,* an Alabama plaintiff was injured at work by a machine defectively designed and manufactured by the foreign defendant. 111 F. Supp.2d 1281, 1283 (M.D. Ala. 2000).  In determining whether the exercise of personal jurisdiction comported with fair play and substantial justice, the court found that "[u]nlike *Asahi*, this is not a case of a foreign corporation seeking indemnification.  Here, Plaintiff is an Alabama citizen seeking relief for personal injuries sustained in an incident involving [Defendant's] allegedly defective machine. Accordingly, Plaintiff has a manifest interest in having his case adjudicated in Alabama." *Id.* at 1287.

This court similarly finds that exercising personal jurisdiction over Pontiac Coil comports with fair play and substantial justice.  Although headquartered in Clarkston, MI, Pontiac Coil has 500 employees with facilities in Clarkston, Michigan, in Searcy, Arkansas, and in Nottingham, England. (George Depo. 14:2-6.)  Far from being a "mom and pop shop," Pontiac Coil is a global corporation that utilizes sales representation firms in Dayton, Ohio, in England, and in Germany to call on specific accounts. (George Depo. 16:12-17.)  Unlike the Japanese defendant

in *Asahi*, which had to "traverse the distance between [its] headquarters in Japan and the Superior Court of California . . . [and] submit its dispute . . .to a foreign nation's judicial system," Pontiac Coil must merely take a short trip from Michigan to Alabama, and submit its dispute in federal court." *Asahi,* 480 U.S. at 114. Considering Pontiac Coil's size, its extensive global network and activities, its geographical proximity, and the increasing ease of transportation and communication, the court finds that litigating in states other than Michigan, Arkansas, or possibly Ohio, including Alabama, does not pose a substantial burden.

In terms of Alabama's interest in adjudicating the dispute, "Alabama has an interest in seeing that persons using products purposefully sent into the state are not seriously injured because of a product defect." *Morris,* 843 F.2d at 495. With respect to the interstate judicial system's interest in "obtaining the most efficient resolution of the controversy," Alabama is "where the alleged accident occurred, diversity jurisdiction exists, and [several] witnesses reside." *Id.* (internal citations omitted). Evidence and witnesses related to the accident itself would be located in Alabama. *Id.* Finally, this court doubts that any conflicts between the Michigan and Alabama law concerning products liability in a vehicle accident would touch on issues of fundamental social policy. Even if such an issue were to develop, however, "any clash between the states in furthering fundamental substantive social policies can be accommodated through choice-of-law rules." *Id.* (*citing Burger King*, 471 U.S. at 477). Accordingly, considering all the factors in *Burger King*, this court finds that the exercise of personal jurisdiction over Pontiac Coil does not offend traditional notions of fair play and substantial justice.

Having concluded that Pontiac Coil's contacts are related to the cause of action, the result of purposeful availment of the privilege of doing business in Alabama, and consistent with traditional notions of fair play and substantial justice, this court finds that the exercise of personal jurisdiction over Pontiac Coil is consistent with the due process clause of the United States Constitution, and therefore also in compliance with Alabama's long-arm statute.

## **V. CONCLUSION**

For the foregoing reasons, it is hereby Ordered that:

1.  Pontiac Coil's Motion to Dismiss for Lack of Personal Jurisdiction is DENIED.

2. This case shall proceed on the Ray's claims against Pontiac Coil for wantonness, negligence, loss of consortium and violation of the Alabama Extended Manufacturer's Liability Doctrine, as well as its other claims against Pontiac's co-Defendants, as well as co-defendant Visteon's claims against third-party defendant Admiral.

Done this 11th day of July, 2008

/s/ W. Harold Albritton
W. HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE

20

A copy of this checklist is available at the website for the USCA, 11th Circuit at www.ca11.uscourts.gov
Effective on April 9, 2006, the new fee to file an appeal will increase from $255.00 to $455.00.

## CIVIL APPEALS JURISDICTION CHECKLIST

1.    **Appealable Orders:** Courts of Appeals have jurisdiction conferred and strictly limited by statute:

(a)    **Appeals from final orders pursuant to 28 U.S.C. § 1291:** Only final orders and judgments of district courts, or final orders of bankruptcy courts which have been appealed to and fully resolved by a district court under 28 U.S.C.§ 158, generally are appealable. A final decision is one that "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Pitney Bowes, Inc. v. Mestre, 701 F.2d 1 365, 1 368 ( 11th Ci r. 1 983). A magistrate judge's report and recommendation is not final and appealable until judgment thereon is entered by a district court judge. 28 U.S.C. § 636(c).

(b)    **In cases involving multiple parties or multiple claims,** a judgment as to fewer than all parties or all claims is not a final, appealable decision unless the district court has certified the judgment for immediate review under Fed.R.Civ.P. 54(b). Williams v. Bishop, 732 F.2d 885, 885- 86 (11th Cir. 1984). A judg ment which resolves all issues except matters, such as attorneys' fees and costs, that are collateral to the merits, is immediately appealable. Budinich v. Becton Dickinson & Co., 486 U.S.196, 201, 108 S.Ct. 1717, 1721-22, 100 L .Ed.2d 178 (1988); LaChance v. Duffy's Draft House, Inc., 146 F.3d 832, 837 (11th Cir. 1998).

(c)    **Appeals pursuant to 28 U.S.C. § 1292(a):** Appeals are permitted from orders "granting, continuing, modifying, refusing or dissolving injunctions or refusing to dissolve or modify injunctions . . ." and from "[i]nterlocutory decrees . . . determining the rights and liabilities of parties to admiralty cases in which appeals from final decrees are allowed." Interlocutory appeals from orders denying temporary restraining orders are not permitted.

(d)    **Appeals pursuant to 28 U.S.C. § 1292(b) and Fed.R.App.P. 5**: The certification specified in 28 U.S.C. § 1292(b) must be obtained before a petition for permission to appeal is filed in the Court of Appeals. The district court's denial of a motion for certification is not itself appealable.

(e)    **Appeals pursuant to judicially created exceptions to the finality rule:** Limited exceptions are discussed in cases including, but not limited to: Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949); Atlantic Fed. Sav. & Loan Ass'n v. Blythe Eastman Paine Webber, Inc., 890 F.2d 371, 376 (11th Cir. 1989); Gillespie v. United States Steel Corp., 379 U.S. 148, 157, 85 S.Ct. 308, 312, 13 L.Ed.2d 199 (1964).

Rev.: 4/04

2.    <u>**Time for Filing**</u>: The timely filing of a notice of appeal is mandatory and jurisdictional. <u>Rinaldo v. Corbett</u>, 256 F.3d 1276, 1278 (11th Cir. 2001). In civil cases, Fed.R.App.P. 4(a) and (c) set the following time limits:

(a)    **Fed.R.App.P. 4(a)(1):** A notice of appeal in compliance with the requirements set forth in Fed.R.App.P. 3 must be filed in the district court within 30 days after the entry of the order or judgment appealed from. However, if the United States or an officer or agency thereof is a party, the notice of appeal must be filed in the district court within 60 days after such entry. **THE NOTICE MUST BE RECEIVED AND FILED IN THE DISTRICT COURT NO LATER THAN THE LAST DAY OF THE APPEAL PERIOD – no additional days are provided for mailing.** Special filing provisions for inmates are discussed below.

(b)    **Fed.R.App.P. 4(a)(3):** "If one party timely files a notice of appeal, any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this Rule 4(a), whichever period ends later."

(c)    **Fed.R.App.P. 4(a)(4):** If any party makes a timely motion in the district court under the Federal Rules of Civil Procedure of a type specified in this rule, the time for appeal for all parties runs from the date of entry of the order disposing of the last such timely filed motion.

(d)    **Fed.R.App.P. 4(a)(5) and 4(a)(6):** Under certain limited circumstances, the district court may extend the time to file a notice of appeal. Under Rule 4(a)(5), the time may be extended if a motion for an extension is filed within 30 days after expiration of the time otherwise provided to file a notice of appeal, upon a showing of excusable neglect or good cause. Under Rule 4(a)(6), the time may be extended if the district court finds upon motion that a party did not timely receive notice of the entry of the judgment or order, and that no party would be prejudiced by an extension.

(e)    **Fed.R.App.P. 4(c):** If an inmate confined to an institution files a notice of appeal in either a civil case or a criminal case, the notice of appeal is timely if it is deposited in the institution's internal mail system on or before the last day for filing. Timely filing may be shown by a declaration in compliance with 28 U.S.C. § 1746 or a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

3.    <u>**Format of the notice of appeal:**</u> Form 1, Appendix of Forms to the Federal Rules of Appellate Procedure, is a suitable format. <u>See</u> also Fed.R.App.P. 3(c). A <u>pro se</u> notice of appeal must be signed by the appellant.

4.    <u>**Effect of a notice of appeal:**</u> A district court loses jurisdiction (authority) to act after the filing of a timely notice of appeal, except for actions in aid of appellate jurisdiction or to rule on a timely motion of the type specified in Fed.R.App.P. 4(a)(4).