IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| MEREDITH CHADWICK RAY and | ) | |
| PHILLIP RAY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.  3:07cv175-WHA-TFM |
| | ) | (WO) |
| FORD MOTOR COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

### I.  INTRODUCTION

This cause is before the court on a Motion for Summary Judgment filed by Ford Motor

Company ("Ford") (Doc. #123).  The Plaintiffs, Meredith Chadwick Ray ("Meredith Ray") and

Phillip Ray (collectively, the "Rays") filed an Amended Complaint (Doc. #27-1) in this case

alleging that Ford is liable to them on the basis of (1) the Alabama Extended Manufacturer's

Liability Doctrine ("AEMLD") (Count One); (2) negligence (Count Two); (3) wantonness

(Count Three); and (4) loss of consortium (Count Four).[1]  Ford moved for summary judgment on

all four Counts on the basis of spoliation of the evidence, and, in the alternative, moved for

summary judgment with respect to Count One and Count Three.  For the reasons to be discussed,

the Motion for Summary Judgment is due to be DENIED.

### II.  SUMMARY JUDGMENT STANDARD

---

[1]The Rays also alleged claims against two other defendants, who are no longer parties to
this case.  *See* Docs. #142, #145.

Summary judgment is proper "if there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion," relying on submissions "which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. Once the moving party has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Id.* at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, the evidence of the non-movant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

### III.  <u>FACTS</u>

The submissions of the parties establish the following facts, viewed in a light most favorable to the Rays, the non-movants:

### A.  **The Accident**

On April 21, 2006, Meredith Ray parked her 2002 Mercury Mountaineer in a parking lot in Lee County, Alabama to make a payment to Acceptance Insurance.  She left the vehicle running and did not engage the parking brake, though she shifted her vehicle into "park."  Her 10-month-old daughter and her 3-year-old niece remained in the vehicle.

Meredith Ray completed her transaction with Acceptance Insurance, left the building, and began walking between her vehicle and the side of a building to return to the driver's seat of her vehicle.  At this time, Meredith Ray's niece, without depressing the brake pedal, moved the transmission shift lever into gear, causing the vehicle to move forward and to crush Meredith Ray against the wall.

After the accident, a bystander entered the vehicle and shifted it from drive to reverse, to stop it from crushing Meredith Ray, and then shifted it into park.  Other individuals shifted the vehicle several times to move it to different locations and eventually into storage.

**B.     Brake Transmission Shift Interlock Systems**

The 2002 Mercury Mountaineer at issue in this case was equipped with a brake transmission shift interlock system ("BTSI").  The BTSI is designed to prevent a driver from shifting the vehicle's transmission out of park without depressing the brake.  The BTSI is designed to accomplish this by means of a pin.  If the BTSI pin has not retracted, and the vehicle is in park, a driver should not be able to shift the vehicle out of park because the vehicle's swing arm will not be able to move past the BTSI pin.  However, if the driver depresses the brake, the vehicle sends an electrical signal to the BTSI, causing the pin to retract, thus allowing the driver to shift the vehicle out of park.

Meredith Ray's 2002 Mercury Mountaineer is part of Ford's U152 vehicle platform.  The U152 platform had a history of shifting problems prior to the date of Meredith Ray's accident.  Ford had created a document called a "Six Sigma Project Charter" which detailed customer complaints and engineer findings about a shifting problem in U152 platform vehicles (the "Six Sigma Documents").  The Six Sigma Documents state that:

> Customers are dissatisfied with the increased efforts to shift in and out of park that occur over time on all U152 left-hand drive Explorer and Mountaineer vehicles with column shift systems.  Analysis indicates that the steering column [BTSI] pin has a 400 millisecond built-in time delay to retract upon brake apply.  Customers are shifting more quickly than the pin retracts.  This causes the pin to contact the swing arm ramp resulting in wear over time and eventual higher shift efforts.

Sharon Welch Dep. at 19:8-23.  The Six Sigma Documents state that this problem "was missed during previous DV/PV testing because the shift system was moved at a slow enough rate to allow the pin to be electrically retracted and never have the [swing arm] impact the pin."  Pl.'s

4

Ex. D at 13. This problem was the highest warranty expenditure on a daily basis for all of Ford steering. Snider Dep. at 22:17-24; Porter Dep. at 35:21 - 36:02.

Ford's engineers investigated this problem, and identified as one of the "error states" of the BTSI system, that "[c]ustomer is able to shift out of Park even without putting foot on brake . . . ." Pl.'s Ex. D at 6. Ford's Six Sigma Documents indicate that, over time, due the swing arm coming into contact with the BTSI pin, the swing arm would develop a divot, which caused problems shifting into park. *See, e.g.*, Pl.'s Ex. D at 12-13.


**C.     Testing the Vehicle**

On August 9, 2006, Wayne McCracken ("McCracken"), the Rays' expert, inspected Meredith Ray's 2002 Mercury Mountaineer. McCracken Dep. at 75:5-7. While inspecting the vehicle, McCracken stated that he shifted the vehicle approximately 5 to 10 times, at various speeds, to determine whether it had a defect. McCracken Dep. at 90:7-9. Subsequently, on February 27, 2007, the Rays filed suit against Ford. The vehicle was later inspected by McCracken and disassembled on March 14, 2008, at which time Ford's representatives were present. McCracken Dep. at 185:10-19.

McCracken's testing and inspection indicated problems consistent with those discussed in Ford's Six Sigma Documents. Specifically, McCracken found instances when the BTSI failed to operate properly after the vehicle had been shifted into park. For example, video evidence presented by the Rays, filmed on August 8, 2008, shows the BTSI pin contacting with the swing arm and causing erratic movement as the vehicle is shifted in and out of park. *See* Pl.'s Ex. M. The Rays assert that this video evidence shows that "although the transmission is fully in park,

5

because the BTSI fails to operate properly the operator can then shift the vehicle from park into a forward gear without stepping on the brake." Pl.'s Resp. at 13.

Additionally, McCracken noted that a dimple had developed on the swing arm in Meredith Ray's vehicle. He concluded that "[t]he appearance and condition of the [BTSI] at that time . . . is identical to information and photographs contained in the [Six Sigma Documents]." Pl.'s Ex. F at 2.

## IV. DISCUSSION

Ford has moved for summary judgment in this case. Ford argues that it is due summary judgment (1) with respect to the Rays' entire case because of the doctrine of spoliation of the evidence; (2) with respect to the Rays' AEMLD claim because the Rays cannot show that the 2002 Mercury Mountaineer was defective, or that it reached the Rays without substantial change in its condition; and (3) with respect to the Rays' wantonness claim because the Rays have not shown wanton conduct. The court rejects each of these arguments, and concludes that summary judgment is due to be DENIED.

### A.       Spoliation of the Evidence

Ford's first argument is that it is due summary judgment with respect to all of the Rays' claims under the doctrine of spoliation of the evidence.

Federal law governs the imposition of sanctions for spoliation of the evidence in a diversity suit because spoliation sanctions are an evidentiary matter. *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005). The Eleventh Circuit also has explained, however,

6

that in evaluating the need for sanctions, federal courts look to factors enumerated in state law, because federal law does not set forth specific guidelines regarding sanctions for spoliation. *Id.*

The parties agree that Alabama state law is the relevant state law to look to in this case. In analyzing the propriety of sanctions for spoliation of the evidence, the Alabama Supreme Court applies five factors: (1) the importance of the evidence destroyed; (2) the culpability of the offending party; (3) fundamental fairness; (4) alternative sources of the information obtainable from the evidence destroyed; and (5) the possible effectiveness of other sanctions less severe than dismissal. *Story v. RAJ Properties, Inc.*, 909 So.2d 797, 803 (Ala. 2005).

Although the Eleventh Circuit has looked to state law in analyzing spoliation of the evidence, the Eleventh Circuit has also outlined the boundaries of sanctionable conduct under federal law. In *Flury*, the Eleventh Circuit explained that dismissal is the most severe sanction available, and should only be used where there is a showing of bad faith and where lesser sanctions will not suffice. *Flury*, 427 F.3d at 944. In describing the standard governing bad faith, the Eleventh Circuit explained that the law does not require a showing of malice, but that instead, in determining whether there is bad faith, a court should weigh the degree of the spoliator's culpability against the prejudice to the opposing party. *Id.* at 946. Although the Eleventh Circuit was examining Georgia law in *Flury*, the court explained that "Georgia state law on spoliation is wholly consistent with federal spoliation principles." *Id.* at 944.

Interpreting the applicable Eleventh Circuit law, this court has stated that, "where the only sanction sought is summary judgment . . . only if there is a finding of bad faith, determined by weighing the degree of the spoliator's culpability and prejudice to the opposing party, and only if no lesser sanction will suffice, may a sanction as severe as summary judgment be

imposed." *Greyhound Lines, Inc. v. Goodyear Tire & Rubber Co.*, No. 3:08cv516-WHA, 2009 WL 798947, at *2 (M.D. Ala. Mar. 25, 2009) (Albritton, J.) (denying summary judgment, sought on spoliation grounds, when bus company suing tire company over an allegedly defective tire on its bus repaired the bus without giving the tire company a prior opportunity to inspect the bus, though it provided the tire company with the allegedly defective tire).

Ford argues that, under the applicable legal standard, it is due summary judgment because the 2002 Mercury Mountaineer was shifted on several occasions after the accident, and this shifting must have caused the defect that the Rays now complain of.  Ford notes three instances of shifting.  First, while the vehicle was crushing Meredith Ray, a bystander got into the vehicle, and shifted it to move it off of Meredith Ray, and then shifted it into park.  Second, the vehicle was shifted several times after the accident to move it from the accident scene and eventually into storage.  Third, McCracken stated that he shifted the vehicle approximately 5 to 10 times while testing it.

The court's first duty, as charged by the Eleventh Circuit under *Flury*, is to examine the evidence of bad faith.  Ford presents no evidence of malice on this point.

Because there is no evidence of malice, to determine whether there is bad faith, this court has been instructed to weigh the culpability of the Rays and the prejudice to Ford.  *Flury*, 427 F.3d at 926.  The court finds no culpability with respect to two of the shifting incidents: the pedestrian moving the vehicle off of Meredith Ray to stop it from crushing her, and other parties moving the vehicle to storage.  The first act was taken by a third party who was trying to save Meredith Ray from severe bodily injury or death, and such an act, even if taken at the request of Meredith Ray, surely cannot be considered to be evidence of bad faith on the part of the Rays.

8

Neither does the moving of the car to storage show bad faith.  Ford has not explained who moved the vehicle to storage, who asked them to do so, or submitted any facts that would show bad faith.  Even if the Rays requested that someone move the vehicle to storage, Ford does not explain how this shows culpability on the part of the Rays.

Thus, the only potential evidence of culpability presented by Ford is evidence suggesting that the Rays acted willfully by not inviting Ford, as a potential defendant in a future claim by the Rays, to inspect the vehicle before McCracken began shifting it.  However, neither party has presented any evidence that McCracken shifted the vehicle in a manner designed to alter it, or that McCracken thought or could have reasonably thought that shifting the vehicle approximately 5 to 10 times would cause the BTSI defect in this case.  In fact, Ford's own Six Sigma Documents, which McCracken was aware of, show that the BTSI problem at issue developed in vehicles over the course of thousands of miles of driving and shifting.  *See, e.g.*, Pl.'s Ex. D at 3, 7-8, 9, 13.  Additionally, McCracken testified that he believed that it would take a long time, not merely "5 to 10" shifts, to cause the problem that existed in Meredith Ray's vehicle.  In his deposition, McCracken stated:

> Q.  Is it possible that . . . this divot, as you described it, could have been created in one of these subsequent shiftings to the time when the accident occurred?
>
> A.  I don't believe that's probable at all, no.
>
> Q.  Why not?
>
> A.  Because of the size and depth of the divot.  *It takes repeated cycles* for that to occur.  I don't know how many.  I suspect it depends on how much contact there is between the pin and the swing arm.
>
> Q.  Well, you -- I thought you previously testified that you did not measure the size and depth of the divot.

9

A.     I did not, but I can visually see it.

Q.     Do you know at what size and depth is required in order to provide this false
       Park position?

A.     Well, I think the answer is *thousands of miles of use*.  That seems to be the
       conclusion of the [Six Sigma Documents].  Also, if you take a look at the
       warranty claims, you're going to see sometimes *as much as a couple of years
       between date of sale and warranty claim*, so obviously people are putting
       thousands of miles on these vehicles before the divot becomes of a size to
       start giving false Park conditions.

Q.     Okay.

A.     It doesn't happen in a few shifts, in other words.

Q.     So it wouldn't happen in 10 to 20 shifts, --

A.     No.

Q.     -- is what you're saying?  No?

A.     No.

McCracken Dep. at 187:14 - 188:23 (emphasis added).  This evidence shows that McCracken

reasonably believed that he was not altering the vehicle during his testing.  Ford presents no

counter evidence or argument on this point.  Therefore, the court concludes that any culpability

the Rays could possibly have attributed to them was minimal at best.  *See Wal-Mart Stores, Inc.

v. Goodman*, 789 So. 2d 166, 176 (Ala. 2000) (refusing to grant a new trial on spoliation grounds

because "nothing in the record shows that Goodman knew that the entire box would be a key

piece of evidence in her case, and Wal-Mart provided no evidence to show that Goodman

intentionally destroyed the box in order to inhibit Wal-Mart's case").

       On the issue of prejudice to Ford, Ford contends that it has been prejudiced because

evidence of the vehicle before it was shifted by McCracken would have been extremely

important to its defense.  Ford argues that without an opportunity to inspect the vehicle in its condition at the time of the accident, Ford cannot determine whether the defect at issue existed at that time, or whether the defect was actually caused by shifting that occurred after the accident.

In support, Ford cites a number of Alabama cases in which the evidence at issue was completely destroyed by the plaintiffs, and argues that, like the defendants in those cases, it cannot adequately defend itself due to the spoliation caused by the post-accident shifting in this case.  *See, e.g.*, *Verchot v. Gen. Motors Corp.*, 812 So. 2d 296, 301-02 (Ala. 2001); *Capitol Chevrolet, Inc. v. Smedley*, 614 So. 2d 439, 442-43 (Ala. 1993); *Cincinnati Ins. Co. v. Synergy Gas, Inc.*, 585 So. 2d 822, 827 (Ala. 1991); *Iverson v. Xpert Tune, Inc.*, 553 So. 2d 82, 84-87 (Ala. 1989).  However, those cases are distinguishable from this case for several reasons.  First, the evidence in this case was not completely destroyed; the BTSI and shifting system still exists, and Ford has inspected it.  *See Vesta Fire Ins. Corp. v. Milam & Co. Const., Inc.*, 901 So. 2d 84, 99 (Ala. 2004) (rejecting argument for spoliation because, among other reasons, "there has not been complete destruction of material evidence; rather, a significant body of evidence remains").  Second, reading the evidence in the light most favorable to the Rays, the non-movants, the court cannot find that the defect at issue was *caused* by the limited amount of post-accident shifting that occurred in this case.  This conclusion is supported by both the Six Sigma Documents as well as McCracken's testimony, as discussed above.  Third, unlike cases in which the evidence was completely destroyed, Ford can adequately defend itself before a jury in this case, through cross examination and testimony of its own experts.  If Ford desires to argue that McCracken may have created the defect in the 2002 Mercury Mountaineer, it can do so before a jury.  But Ford has not presented enough evidence at this point in the proceedings to eliminate any issue of

11

fact on that point.  In sum, while Ford may have suffered some prejudice by not being able to examine the vehicle prior to the limited post-accident shifting in this case, since the Rays did not call Ford to the scene of the accident before the vehicle was moved off Meredith Ray and driven to storage and before they had an expert inspect the vehicle and shift the transmission a few times before they filed suit, the court concludes that such prejudice does not rise to the level of requiring summary judgment.

Weighing the evidence in favor of the non-moving parties, the Rays, the court concludes that Ford has failed to prove that the Rays acted with such culpability, or that Ford suffered such substantial prejudice, so as to constitute bad faith for which only the sanction of summary judgment would suffice.[2]  Accordingly, summary judgment is due to be DENIED to the extent Ford seeks summary judgment on the ground of spoliation of the evidence.

**B.     Alabama Extended Manufacturer's Liability Doctrine**

Ford argues that it is entitled to summary judgment on the Rays' claim under the AEMLD.

To establish a claim for a defective product under the AEMLD a plaintiff must show that the defendant placed a defective product on the market that was unreasonably dangerous and that caused injury or damage, the defendant was engaged in the business of selling the product, and the product was expected to and did reach the user without substantial change in condition. *Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469 (11th Cir. 1993).

---

[2]Ford has not requested any sanction other than summary judgment.  The court does not suggest, however, that any other sanction would be appropriate.

The Rays in this case bring a claim for design defect under the AEMLD.  That is, they allege that Ford improperly designed the 2002 Mercury Mountaineer that injured Meredith Ray. Ford contends that the Rays' AEMLD claim must fail because (1) the Rays have failed to show a defect in the vehicle; and (2) the Rays have failed to show that the vehicle reached them without substantial change in its condition.  Based on the state of the evidence at this point in the case, the court rejects Ford's arguments.

      1.    *Defective*

Ford first argues that the vehicle is not defective.  A "'defect' is that which renders a product 'unreasonably dangerous,' *i.e.*, not fit for its intended purpose."  *Casrell v. Altec Indus., Inc.*, 335 So. 2d 128, 133 (Ala. 1976).  Thus, for example, a product is defective if it does not meet the "reasonable expectations of an ordinary consumer as to its safety."  *Jordan v. Gen. Motors Corp.*, 581 So. 2d 835, 837 (Ala. 1991).

As another judge in this district has noted, Alabama case law requires an AEMLD plaintiff to come forward with, among other things, at least some evidence to support an inference that the product in question was defective.  *Rudd v. Gen. Motors Corp.*, 127 F. Supp. 2d 1330, 1345 (M.D. Ala. 2001) (Thompson, J.).  Mere proof of an accident with ensuing injuries is insufficient to establish AEMLD fault because "the plaintiff must affirmatively show that the product was sold with a defect or in a defective condition."  *Jordan*, 581 So. 2d at 836-37.

Ford presents no affirmative evidence that the vehicle in this case lacked a defect, but instead, emphasizes that the Rays have the burden to present evidence of a defect.

The Rays presented evidence of a defect.  The Six Sigma Documents show that Ford faced a number of warranty claims relating to shifting issues prior to Meredith Ray's injury. Additionally, McCracken testified in his deposition as to the BTSI problems, and to his having found evidence of the defective condition in his inspection of the Rays' vehicle.  Also, both the Six Sigma Documents and McCracken's testimony show that the BTSI problems could cause a safety problem with the vehicle: specifically, the vehicle could shift out of park without the driver depressing the brake.  Reading this evidence in a light most favorable to the Rays, the non-moving party, the court finds that a reasonable jury could find that a defect existed in the 2002 Mercury Mountaineer because it did not meet the reasonable expectations of an ordinary consumer as to its safety.

2.      *At the Time it Left Ford's Hands*

Ford next argues that the Rays failed to show that the vehicle reached them without substantial change in its condition.  Ford does not cite any evidence supporting its position, despite stating that "the evidence in this case is directly to the contrary" of the Rays' position.

In response, the Rays introduced evidence supporting their argument that the BTSI problems at issue were a defect that existed when the 2002 Mercury Mountaineer left Ford's control.  Specifically, the Rays introduced Ford's Six Sigma Documents which stated that a number of vehicles in Ford's U152 platform, such as the 2002 Mercury Mountaineer, suffered from a BTSI problem that could cause the transmission to shift out of park without the brake first being applied.  In addition, the Rays introduced McCracken's expert testimony, in which McCracken said that the defect that caused the accident in this case was the same BTSI problem

14

in Ford's U152 platform.  This evidence, read in a light favoring the Rays, can establish that the alleged defect existed at the time the vehicle left Ford's control.

In arguing that the Rays cannot prove that the vehicle was defective at the time it left Ford's hands, Ford reiterates the previous arguments it made regarding spoliation.  Specifically, Ford argues that the Rays cannot prove that the vehicle was defective at the time it left Ford's hands because the Rays were responsible for causing the defect at issue through post-accident shifting of the vehicle.  To the extent this argument is relevant, the court rejects it for the same reasons previously discussed.

In sum, a genuine issue of material fact exists for a jury to determine, and summary judgment is due to be DENIED as to the Rays' AEMLD claims.


**C.     Wantonness**

Ford argues that it is entitled to summary judgment on the Rays' wantonness claim, and therefore, the Rays may not recover punitive damages.  Punitive damages may be awarded "in a tort action where it is proven by clear and convincing evidence that the defendant consciously or deliberately engaged in . . . wantonness."  Ala. Code § 6-11-20(a).

Alabama courts have defined wantonness as "the conscious doing of some act or the omission of some duty while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result."  *Bozeman v. Centr. Bank of the South*, 646 So. 2d 601, 603 (Ala. 1994) (quoting *Stone v. Southland Nat'l Ins. Corp.*, 589 So. 2d 1289, 1292 (Ala. 1991)).  While "it is not essential that the actor should have entertained a specific design or intent to injure the plaintiff," the actor must have been "conscious that injury

will likely or probably result from his actions." *Ex parte Essary*, 992 So. 2d 5, 9 (Ala. 2007) (citing *Joseph v. Staggs*, 519 So. 2d 952, 954 (Ala. 1988)).  "Simple negligence is the inadvertent omission of duty; and wanton or willful misconduct is characterized as such by the state of mind with which the act or omission is done or omitted." *Dorman v. Jackson*, 623 So. 2d 1056, 1058 (Ala.1993) (citations omitted).

Alabama courts have found wantonness claims sufficient to submit to a jury when a defendant is aware of a safety problem, fails to correct it, and the problem causes an injury.  For example, in *Brown v. Turner*, 497 So. 2d 1119 (Ala. 1986), the Alabama Supreme Court held that there was a jury question on a wantonness claim when a plaintiff repeatedly complained to a defendant that a machine in its factory was defective, the defendant did not fix the machine, but instead told the plaintiff that the machine was "not going to hurt anything," and the machine later malfunctioned and crushed the plaintiff's finger.  *Id.* at 1119-20; *see also Lance, Inc. v. Ramanauskas*, 731 So. 2d 1204, 1211-12 (Ala. 1999) (finding wantonness when a defendant vending machine company "knew the necessity for testing electrical receptacles to which its vending machines are connected for adequate grounding," the defendant did not properly train employees to check machines for proper grounding, the defendant's employee failed to check the vending machine at issue, and a child was killed by electrocution as a result); *Duncan v. Ford Motor Co.*, 682 S.E. 2d 877, 886-87 (S.C. Ct. App. 2009) (upholding jury award of punitive damages, under wantonness legal standard like that of Alabama, because defendant Ford knew prior to the time it manufactured the plaintiff's vehicle, based on tests conducted by a group of scientists tasked to determine the cause of under-hood fires in Ford's vehicles, that a seal in the vehicle could fail, and that the failure could cause fires); *cf. Gen. Motors Corp. v. Johnston*, 592

16

So. 2d 1054, 1060-61 (Ala. 1992) (holding that punitive damages awarded by jury on wantonness claim were not excessive when General Motors was aware of a defect in its vehicles that could cause stalling, yet it did not publicly notify any of its purchasers or prospective purchasers of the problem).

Ford states that when it designed, manufactured, and sold U152 platform vehicles, it had extensively tested the steering column and transmission, including the BTSI system, on those vehicles, and knew of no problems with the BTSI at the time it designed, manufactured, or sold those vehicles. The court agrees that there is insufficient evidence to show that Ford's design, manufacture, or sales of vehicles on the U152 platform exhibited wantonness. The Rays do not seriously challenge this argument.

However, the Rays contend that Ford learned, prior to the time that Meredith Ray was injured, that there was a safety problem with U152 platform vehicles, and Ford failed to fix this problem in Meredith Ray's vehicle (presumably through a recall or similar action). Pl.'s Resp. at 23; Compl. ¶ 33. Ford disputes that the Rays can establish that Ford was "conscious that injury will likely or probably result from" its omission during this time period.

The Six Sigma Documents, as well as deposition testimony, show that Ford was aware of BTSI problems on the U152 platform, including the possibility that customers could shift out of park without stepping on the brake, and that BTSI problems were a large warranty expense for Ford on U152 platform vehicles. Ford was also aware that this was a safety concern, as its Six Sigma Documents state that "[t]he BTSI is design [sic] to prevent the customer from shifting out of Park unless their foot is on the brake . . . ." Pl.'s Ex. D at 13. Mark Taylor, a design engineer who testified on Ford's behalf, stated that a faulty BTSI was a safety issue, because a faulty BTSI

could cause "unintended vehicle movement."  Taylor Dep. at 58:24 - 59:5.  Furthermore, because the Six Sigma Documents were created prior to the date of Meredith Ray's accident, Ford was aware of this problem prior to the date that Meredith Ray was injured.  Finally, there is no evidence that Ford warned the Rays of this defect or issued a recall, nor does Ford contend that it did so.

Ford argues that this evidence is insufficient to meet the state of mind requirement for wantonness.  Ford argues that the Six Sigma Documents do not actually state that *customers* were able to shift their vehicles out of park without depressing the brake.  Rather, Ford argues that the Six Sigma Documents state that *engineers*, while attempting to determine the extent of the shifting problems, found that one of the potential problems was that it was possible to shift out of park without depressing the brake.  Ford emphasizes this point by noting that there have only been two claims,[3] including the claim in this case, made to Ford by customers with respect to a BTSI problem.  On the other hand, Ford admits that there have been thousands of steering column warranty repairs, for shifting-related issues, and that the BTSI is a component in the steering column.

Ford's argument is problematic.  Ford's argument weighs in Ford's favor in the sense that it shows that the BTSI defect was not so obvious that the entire scope of the defect was brought to Ford's attention by customers.  Instead, Ford had to test the U152 vehicles before it realized that they could be shifted out of park without depressing the brake.  However, the fact that this problem was not obvious does not absolve Ford, because the fact of the matter is that Ford *actually knew* of the problem that the plaintiffs contend caused Meredith Ray's injuries.

---

[3]It is unclear what Ford means by a "claim."

18

Regardless of whether Ford knew that customers had previously experienced this problem, or discovered the specific problem through its own testing, Ford admits that it *knew*, prior to Meredith Ray's injury, that there was a problem that could allow U152 platform vehicles to shift out of park without a customer depressing the brake.

In sum, the court concludes that, reading the evidence before it at this stage of the proceedings in the light most favorable to the Rays, there is sufficient evidence to make the issue of wantonness a jury question, and accordingly, summary judgment is due to be DENIED with respect to this claim.  This issue may be revisited at trial by proper motion after the evidence is presented there.

## V.  <u>CONCLUSION</u>

For the foregoing reasons, the Motion for Summary Judgment (Doc. #123) is ORDERED DENIED.

Done this 1st day of June, 2011.

/s/ W. Harold Albritton
W. HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE